STATE v. BARRY NORMAN JACKSON.

147 N. W. (2d) 689.

January 6, 1967—No. 39,951.

*John J. Killen, Jr.,* for appellant.

*Robert W. Mattson,* Attorney General, *John C. Arko,* County Attorney, and *Keith M. Brownell,* Assistant County Attorney, for respondent.

KNUTSON, CHIEF JUSTICE.

Defendant was convicted after a trial by a jury of the crimes of kidnapping, rape, and robbery. He appeals from an order denying his motion for judgment notwithstanding the verdict or for a new trial.

On April 21, 1964, Frederick Martin, Jr., a 19-year-old airman at the Duluth Air Base, picked up 19-year-old Carol Suihkonen, a girl he had

dated for about 4 months, at her home in Duluth. They went for a ride and later parked in Martin's car on a side road near Lake Superior a few miles north of Duluth. They arrived at that spot at about 8:45 p. m. Approximately a half hour later an armed, heavy-set man wearing glasses and a white bandanna on his face flung open the driver's door and told Martin to get out of the car with his hands up. Martin was then ordered to the rear of the car, where he noticed a lighter, slender man who also had a gun. The first man ordered Martin into his trunk and locked the trunk lid.

The two masked men placed Miss Suihkonen between them in the front seat of Martin's car and drove about a mile down the highway. There they stopped the car and locked Miss Suihkonen inside the trunk with Martin. At the time that the heavy-set man opened the trunk lid to put Miss Suihkonen inside, Martin turned to try to get a look at the man, but the man cocked his revolver and told Martin that if he moved again he would be killed. The car was then driven for about a half hour until it got stuck in a ditch.

The trunk was opened and the headlights from another car, parked a block or two behind Martin's car, lighted up the area somewhat. The heavy-set man ordered Miss Suihkonen out of the trunk and Martin was robbed of his billfold by the same man. The trunk lid was again closed on Martin and an oily rag was placed over Miss Suihkonen's face. During this period of time, which Miss Suihkonen estimated to be about a minute or two, the heavy-set man did not have his mask on and Martin and Miss Suihkonen both had a chance to look at his face.

The other car was driven up and Miss Suihkonen was placed between the two men in the front seat. The car was driven about 5 minutes, then stopped, and Miss Suihkonen was put into the rear of the car with the heavy-set man. While the other man drove, her clothes were partially removed and the heavy-set man completed sexual intercourse with her. The car was again stopped, the lighter man got into the rear seat and also completed sexual intercourse with Miss Suihkonen while the heavy-set man drove. Sometime later the car was parked and each of the men completed sexual intercourse with Miss Suihkonen once more.

The men eventually asked Miss Suihkonen where she lived and she

directed them to her home. They released her about a block from her home at about 11 or 11:15 p. m. Her hands had been tied together behind her back by using her bra and the oily rag still covered her face. Miss Suihkonen went into her home and was taken to the hospital by her mother, where she was examined by an intern. Tests revealed that she had had sexual intercourse with someone that evening. The doctor found no bruises, lacerations, or abrasions.

Martin was able to release himself from the trunk of his car, found a house nearby, and called the police prior to the time Miss Suihkonen was released.

The following morning, April 22, a burglary of the Donald MacDonald residence in Duluth was reported to the police by the caretaker of the home. That same morning a loaded revolver was found by some children on the chassis of an automobile parked behind the house where defendant, Barry Jackson, lived with coaccused Herrick Hellem. It was turned over to the police and when checked out was found to be from property taken in an earlier burglary in Duluth on April 17, 1964. The police then checked the area where the revolver was found and discovered the property taken in the MacDonald burglary in the attic of the garage on the property where defendant Jackson lived.

While the police were investigating the finding of the revolver, their car was spotted by defendant Jackson. Hellem and he left town in Jackson's 1955 Oldsmobile, traveling through Wisconsin and Iowa and into Wyoming, where they worked for a month. Jackson testified that they left Wyoming; abandoned the car near Colorado Springs, Colorado; went to Dallas, Texas; and after staying there a few days returned to Duluth and voluntarily gave themselves up to the police and admitted they had committed the MacDonald burglary and other burglaries.

Jackson was questioned concerning the rape and kidnapping of Miss Suihkonen and the robbery and kidnapping of Martin, but denied any participation in those acts. He admitted being with Hellem the entire evening of April 21, 1964, but stated it was impossible for them to have been guilty of the crimes because they were burglarizing the MacDonald residence at the time.

Separate lineups were held for both men; both Martin and Miss Suih-

konen identified Hellem as the heavy-set man with glasses, but neither could identify defendant Jackson. In fact, Martin picked out another man in the lineup with Jackson as being the lighter assailant.

Two or three days after the crimes occurred Martin received his Air Force identification card, which had been in his billfold at the time he was robbed, in the mail. It had been dropped in a mailbox and was found by postal employees. Police officers testified that during the questioning of Jackson he admitted that he placed the identification card in the mail, but Jackson testified that the police brought up the topic and he only commented that putting the ID card in the mail was a nice gesture by whoever did it, because losing an ID card means a restriction of a service man's liberty off base.

Jackson's car was located in Wichita, Kansas, and returned to Duluth. It was later examined by the State Crime Laboratory. No evidence of any kind was found to indicate that Miss Suihkonen had ever been present in Jackson's car or that any acts of rape had been perpetrated in the car.

Jackson and Hellem were charged with the robbery and kidnapping of Martin and forcible rape and kidnapping of Miss Suihkonen. They were granted separate trials. Jackson was tried first and convicted of all charges.

■ Defendant asserts as one ground for a new trial that after the trial he discovered that the foreman of the jury was a former deputy sheriff. He concedes that the juror was not interrogated on the voir dire examination as to his present or former occupation, but states that the juror was asked whether there was any reason why he could not be a fair and impartial juror and claims that in answer to that question the juror should have disclosed his former occupation. The trial judge in a memorandum attached to his order denying the motion for a new trial said:

"* * * This Court does not question the statement of Mr. Balach [defendant's attorney at the trial] that he did not know that Mr. Anderson was connected with the Sheriff's office at any time, but if it weren't for the Court's confidence in Mr. Balach's integrity, I would state that it would seem absolutely incredible that Mr. Balach, who was at one time assistant county attorney when Edwin Anderson was one of the outstand-

ing deputy sheriffs on the first floor in the Court House, and Mr. Balach's office was on the third floor, that Mr. Balach would not know that Anderson was a deputy sheriff. In addition to that, there is no reason to doubt Mr. Anderson's integrity, at all, as a juror, and if there was certain testimony that would have been favorable to the defendant in this case, with all of his background Mr. Anderson would no doubt have been one of the first jurors to discern it."

We accept as true Mr. Balach's affidavit that he did not know juror Anderson was a former deputy sheriff; we also realize that in all probability defendant would have exercised one of his peremptory challenges to strike Mr. Anderson had he known of his former occupation.

The authorities are not at all in harmony concerning whether it is error per se to permit police or other law-enforcement officers to act as jurors. The subject is annotated in 140 A. L. R. 1183 and it would serve no useful purpose for us to discuss the cases pro and con in this opinion. For a note on a closely analogous topic, see 21 Minn. L. Rev. 608.

We do have a number of statutory exemptions from jury service,[1] but under Minn. St. 631.33 these exemptions are a privilege of the exempt person and not a disqualification. We have not had occasion to consider the precise question of the propriety of a former deputy sheriff's serving as a juror, but we have considered some related questions regarding the right to a new trial after discovery that jurors were either subject to challenge for implied bias or so undesirable that a peremptory challenge would probably have been exercised had the facts been known. Thus, in State v. Boice, 157 Minn. 374, 376, 196 N. W. 483, we held that discovery that a juror was the husband of complainant's cousin in a paternity case did not ipso facto lead to a new trial when discovered after the trial. We said:

---

[1] Minn. St. 3.081, exempting members, officers, and employees of the legislature during a legislative session; § 192.24, exempting members of the National Guard; § 628.43, exempting a number of public officials, including constables, and persons engaged in several other employments and professions, including attorneys at law; § 628.44, exempting the director of forestry and his employees.

"* * * The rule is that a defeated litigant is not entitled as a matter of right to have a verdict set aside because a juror was incompetent, although his incompetency was not known or discovered until after the trial. In such case there may be an appeal to the discretion of the trial court, whose duty it is to consider the nature of the objection to the juror, the diligence exercised to ascertain it in due time, and the other circumstances of the case."

In State v. Durnam, 73 Minn. 150, 75 N. W. 1127, it appeared that one of the jurors was not a citizen. There again we held that discovery after trial of a cause for challenging a juror did not per se require a new trial. In State v. Polk, 263 Minn. 209, 116 N. W. (2d) 540, we held that discovery that one of the jurors was admitted to practice law in another state did not necessarily require a new trial even though in all probability such juror would have been challenged had the fact been known at the time he was examined. And again, in Atkinson v. Mock, 271 Minn. 393, 135 N. W. (2d) 892, it appeared after trial that one of the jurors was a first cousin once removed of the plaintiff and as such subject to challenge for implied bias under § 631.31; but that after-trial discovery of such fact would not necessarily lead to a new trial.

Here there is no showing of actual bias. While it may be a justifiable assumption that a former deputy sheriff would be more inclined to believe police officers with whom he had worked in the past than witnesses of an accused defendant, that is not necessarily so. The trial court, being acquainted with the juror, was of the opinion that there was no reason to doubt his integrity. We think a matter of this kind must be left largely to the discretion of the trial court except possibly where the evidence is of doubtful sufficiency to sustain a conviction.

■ Aside from the above assignment of error, defendant's thrust is directed mainly at the action of the trial court in injecting himself into the trial by means of "judicial levity, assistance to the prosecuting attorney, and prejudicial comments on certain testimony." We have carefully examined a lengthy transcript of all the evidence, and while we are convinced the court did inject itself into the trial far more than should be done, we are not persuaded that defendant was thereby deprived of a fair trial. The same may be said of his complaint of judicial levity. A

long trial may become tedious and the temptation exists to liven it up a bit; but there is too much danger that such action by the presiding judge may lead the jury to believe that he considers the defense a sham to justify succumbing to this temptation. We have discussed this question of the court's interposition in a case in recent decisions. See State v. Mancino, 257 Minn. 580, 102 N. W. (2d) 504, where we reversed a conviction due to the trial judge's comments on the evidence. In State v. Rasmussen, 268 Minn. 42, 128 N. W. (2d) 289, where we discussed some of our other cases on this subject, we held there should not be a new trial. Here also some of the court's remarks could better have been omitted, but we do not believe they were so prejudicial as to require a new trial.

■ Complaint is made of the admission of two pieces of evidence. The gun which was found on the chassis of an automobile behind the house in which defendant and Hellem lived was admitted over the objection of defendant. While it was never shown that this revolver was the one used by the perpetrators of the crimes for which defendant was being tried, it had a relevance in that the discovery led to the examination of the premises at which defendant lived and the discovery there of the property taken in the MacDonald burglary. The MacDonald burglary was used by defendant as an alibi to show that he could not have committed the crimes for which he was being tried because at that time he was in the act of committing the burglary. While the revolver had no relevance in so far as defendant's commission of the crimes for which he was being tried is concerned, it did have an incidental connection with the whole scheme of things and we see no harm in its admission.

■ In addition, the court permitted the police officers to testify that near defendant's mother's cottage they found tracks of automobile tires which were similar to those found at the scene of the crime. They were unable to make casts of these tire treads but their testimony was connected up in some degree by the testimony of the dealer who had sold the automobile to defendant. The dealer testified that the tires on the automobile when it was brought back from Wichita, Kansas, were the same ones that were on the car when he sold it. While it is impossible to definitely prove the tire tracks found at the scene of the crime were

the same as those found near defendant's mother's cottage, we see no prejudicial effect from this evidence.

■ Finally, it is the contention of defendant that the evidence did not sustain his conviction of the crimes for which he was tried. Essentially it is his contention that he was deprived of the right to a separate trial and a fair trial because Hellem was really tried and not defendant. The court did require Hellem to be present in the courtroom and to stand up when called upon so that he could be identified by Martin and Miss Suihkonen. They were never able to identify defendant as one of the participants in the crime, but the evidence is conclusive that defendant and Hellem were together during the whole evening. Even defendant bases his defense on that fact. He claims that he was with Hellem and took part in the burglary of the MacDonald home at the time the crimes for which he was being tried were committed and therefore could not have been a participant in them. Hellem was never asked to testify. All he did was stand up in the courtroom so that he could be identified as the larger of the two men who participated in the crimes for which defendant was being tried. Both Martin and Miss Suihkonen were able to identify him as the one they saw at the scene of the crime. While the evidence against defendant is circumstantial, the evidence against Hellem was direct, and if Hellem and defendant were together the whole evening the inference was permissible that defendant was the second of the two men who took part in the commission of the crime. Looking at the record as a whole, we are convinced that the evidence is sufficient to sustain this conviction.

With respect to the validity of evidence showing association at the time a crime was committed with one who admittedly took part in the crime, or was proved to have done so, as circumstantial proof that defendant was a participant in the crime, see State v. Biehoffer, 269 Minn. 35, 129 N. W. (2d) 918; State v. Mathiasen, 267 Minn. 393, 127 N. W. (2d) 534.

The fingerprints of defendant were found in the MacDonald home. There is no showing, outside of the claims of the defendant, what time of the night the burglary was committed. It does appear that while the burglars were in the MacDonald home they cooked and ate some steaks

which they found in the freezer; and although defendant relies on the burglary as an alibi, the jury could well believe that the burglary was committed after the crimes for which he was tried.

While we are convinced that there have been some things done during the trial of this case that could better have been left undone, an examination of the entire record leads us to believe that the defendant has had a fair trial and that the evidence is such that the conviction should be affirmed.

Affirmed.

MR. JUSTICE PETERSON, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.