# MARY OLBERG, A MINOR, BY JOHN ERLING OLBERG, HER FATHER AND NATURAL GUARDIAN, AND ANOTHER v. MINNEAPOLIS GAS COMPANY.

191 N. W. (2d) 418.

October 22, 1971—No. 42612.

O. C. Adamson II, W. James Fitzmaurice, Faegre & Benson, and Meagher, Geer, Markham & Anderson, for appellant.

Miller & Neary, Hvass, Weisman, King & Allen, and Charles T. Hvass, for respondents.

Heard before Knutson, C. J., and Nelson, Otis, Peterson, and Kelly, JJ.

KELLY, JUSTICE.

Defendant-appellant seeks review of an order granting a new trial on the grounds of jury misconduct. We agree with defendant's contention that the evidence does not show misconduct requiring a new trial and, accordingly, reverse.

The action arose from an automobile-pedestrian accident which occurred about 8 p. m. March 15, 1967, on 62nd Street East adjacent to the St. Paul-Minneapolis International Airport. The minor plaintiff and her companion, both 12-year-old girls, were walking along the south side of the street in a westerly direction. When they reached a point adjacent to the end of a runway, they decided to cross to the north side of the street because there was not enough room to walk on the south side. Plaintiff's companion testified to hurrying across the street because they were "a little bit" afraid of a jet plane which was taking off just then.

Unfortunately, defendant's employee was at that time driving his truck in a westerly direction at between 25 and 30 miles per hour. It was not until he felt a thump and stopped his truck that he realized that he had struck and injured the plaintiff. The driver testified that he did not see either of the girls, although both of his headlights were operating. At the time in question, it was completely dark. An officer at the scene testified that he

understood that the driver had either looked up or ducked when the jet went by close overhead.

At the subsequent trial, the jury retired to deliberate about noon, Thursday, April 2, 1970. Failing to agree, the jurors were allowed to separate that evening, pursuant to Rules of Civil Procedure, Rule 47.03. On Friday, April 3, 1970, at about 9 a. m., the jury resumed its deliberations and, at 10:55 a. m. of that day, returned a unanimous verdict finding both parties equally at fault. Such a verdict, according to Minn. St. 604.01, precludes plaintiffs from recovery of any damages.

Plaintiffs' attorneys notified the trial judge on Monday, April 6, 1970, of possible jury irregularities and requested a hearing which was held on April 8, 1970. At that hearing one of the attorneys informed the court that pursuant to courthouse rumors suggesting improper jury conduct, he had asked his firm's investigator to interrogate jurors. The investigator talked to seven jurors and received a statement from one of them. On the basis of this investigation, a hearing was requested to inquire into the activities of one juror, Mr. Roy N. Hope. Over defendant's objections to such a proceeding, the hearing was set for April 10, 1970.

The April 10 hearing inquired into two specific subjects: (1) Whether Hope on the evening of April 2, 1970, when the jury was separated, rode in a car on three occasions and observed the area lit by the vehicle's headlights to ascertain the width of the area brightened, and whether he communicated his observations to the jury on April 3, 1970; and, (2) whether an acquaintance who, 3 months earlier, had struck a pedestrian at night had told Hope that it was impossible to see a pedestrian at nighttime crossing in front of a car, and whether Hope informed the jury of this discussion. On the first subject, Hope testified as follows:

"[By the Court]  Q.  Did you, after you had been selected as a juror on the Olberg case, make any tests with any automobile or automobiles?

"A.   No, I did not.

* * * * *

"[By Mr. Hvass]   Q.   If you will just tell me about the lights, Mr. Hope.

"A.   I took no test on Thursday evening. What I did was that I mentioned to the jury in the discussion back and forth with the many other comments on the part of many of them that I had an opportunity to be—to ride in a car three times Thursday evening and noting myself * * * that I noticed when the lights were on dim that I could not see four lanes of traffic * * *. I took no tests * * *.

* * * * *

"Q.   You told the jury with the lights on dim that you could not see across four lanes of traffic, is that correct?

"A.   Right."

Concerning the second area, the testimony was as follows:

"[By the Court]   Q.   Did you have an opportunity and use that opportunity after you were selected as a juror in the Olberg case to discuss a similar case with a man who had been involved in such similar case?

"A.   There was a similar case that was mentioned as with him, as we were conferring in jury session downstairs, that is true.

* * * * *

"Q.   * * * [D]id you talk to any other person who had been involved in a similar case after you were selected as a juror on the Olberg case?

"A.   No, I don't recall.

* * * * *

"[By Mr. Hvass]   Q.   Mr. Hope, at sometime did you discuss with a friend of yours who was the driver of an automobile involved in an accident with a pedestrian the question of what he could see with the lights of his automobile?

"A.   I would say definitely no to that answer.

"Q.  And you made no representation to any of the members of the jury that you had discussed an accident similar to the Olberg case with a friend of yours who swore that he could not see the pedestrian?

"A.  No. State that question again.

"[By Mr. Hvass]  Would you read it back, please?

"(Question read.)

"A.  No."

Plaintiffs filed a motion for a new trial alleging misconduct of the jury. Accompanying the motion were (1) an affidavit of Stanley W. Davies, plaintiffs' attorneys' investigator, stating that he had interrogated juror Bettie L. Silbernagel and six other jurors and that five of the six agreed with a written statement made by Mrs. Silbernagel, and (2) a statement of Mrs. Silbernagel reciting:

"* * * [Mr. Hope] brought into the jury room information concerning a test he had conducted the night before in three separate vehicles. The purpose of the test was to ascertain how much distance and how wide a space the lights of the vehicle covered. It appeared to me that Mr. Hope was trying to prove a point that on low beam there wasn't enough visibility to see more than one lane of travel. His indication to the Jury members was that you could only see straight in front of you. I don't drive myself so I had to rely on what members of the Jury, such as Mr. Hope, who do drive, for much of my information. Mr. Hope cited a accident in which a person he knew had struck a pedestrian at night under similar circumstances and had sworn he hadn't seen the man."

Oral argument on the motion was heard on May 1, 1970. During argument, plaintiffs' counsel presented to the court a statement by Robert Ray Doeden, a Richfield police officer, taken on February 15, 1970. The statement centered around a January 31, 1970, accident which Officer Doeden had investigated. In the accident James Andrew Guldseth had been driving a car which

struck a pedestrian late at night. The Doeden statement contains the following interchange:

"Q. So then Guldseth had indicated to you that Mr. and Mrs. Roy Hope and Mr. and Mrs. Wayne Larson—did he say they had been dropped off prior to the accident?

"A. Yes. They apparently had been out to a church meeting that evening, these other two couples, and that he had been driving and that he had just left off these—Mr. and Mrs. Larson prior to this."

The trial court then set May 11, 1970, for a hearing to examine the four jurors who had not been contacted by plaintiff.

At the May 11, 1970, hearing none of the jurors recalled a discussion of a prior accident. Three of the jurors testified as follows regarding Mr. Hope's driving observation:

(1) "* * * [H]e did say that he had driven a car the night before and how the headlights—he had good vision with the headlights. * * * I recall he did make that statement."

(2) "* * * [O]ne of the jurors stated that he had an opportunity to ride in three different cars the night before, and as he did so he observed how the headlamps shone on the highway."

(3) "Yes, a statement was made regarding driving a vehicle or different vehicles that evening."

A fourth juror had no recollection of any such discussion.

On May 22, 1970, the trial judge ordered a new trial. Defendant contends that it was error to grant a new trial. It further maintains that it was error for the trial judge to consider the following evidence: (1) The testimony of the jurors concerning who said what in the jury room; (2) the Davies affidavit and the Silbernagel statement which it incorporated; and (3) the Doeden statement.

We reverse.

The central issue in this appeal is whether the trial court abused its discretion in granting a new trial on the grounds of jury misconduct. Incidental concerns include the admissibility

of evidence which the trial court considered and the propriety of questioning jurors after the verdict to ascertain the existence of reversible misconduct.

■ Defendant contends that it was error for the trial judge to consider testimony of jurors as to who said what in the jury room. As a general rule, evidence about matters which inhere in the verdict is not admissible. Thus, evidence of a juror's bias, motives, or beliefs should not be considered. The verdict as finally agreed upon and pronounced in court by the jurors must be taken as the sole embodiment of the jury's act.[1]

An exception to this general rule exists in the situation where the jury has disregarded certain formalities and is guilty of misconduct. See, 8 Wigmore, Evidence (McNaughton Rev. 1961) §§ 2352 to 2354. It is well established that evidence is admissible to show that a juror took an unauthorized view or made an experiment.[2] Such misconduct, however, will only cause reversal when prejudicial.[3]

Although dicta to the contrary exists in several cases, the better rule seems to be that evidence of what was said in the jury room is admissible to show misconduct. It is artificial to allow such evidence from the offending juror or from jurors who observed misconduct outside the jury room,[4] but to exclude the

---

[1] See, e. g., Weber v. Stokely-Van Camp, Inc. 274 Minn. 482, 144 N. W. 2d 540 (1966); Gardner v. Germain, 264 Minn. 61, 117 N. W. 2d 759 (1962), Bauer v. Kummer, 244 Minn. 488, 70 N. W. 2d 273 (1955); State v. Gavle, 234 Minn. 186, 48 N. W. 2d 44 (1951); Collings v. Northwestern Hospital, 202 Minn. 139, 277 N. W. 910 (1938); State v. Cater, 190 Minn. 485, 252 N. W. 421 (1934); Brown v. Duluth, S. S. & A. Ry. Co. 147 Minn. 167, 179 N. W. 1003 (1920); State v. Lentz, 45 Minn. 177, 47 N. W. 720 (1891); 8 Wigmore, Evidence (McNaughton Rev. 1961) §§ 2348 to 2350.

[2] City of Bloomington v. Vinge, 284 Minn. 202, 169 N. W. 2d 752 (1969); State, by Lord, v. Hayden Miller Co. 263 Minn. 29, 116 N. W. 2d 535 (1962); Spinner v. McDermott, 190 Minn. 390, 251 N. W. 908 (1933); Newton v. Minneapolis St. Ry. Co. 186 Minn. 439, 243 N. W. 684 (1932).

[3] See, e. g., City of Bloomington v. Vinge, *supra*.

[4] Cf. City of Bloomington v. Vinge, *supra*.

evidence because the misconduct occurred within the jury room. In State, by Lord, v. Hayden Miller Co. 263 Minn. 29, 35, 116 N. W. 2d 535, 539 (1962), we stated that the exclusion rule "does not extend to statements of jurors who may have on voir dire concealed prejudice or bias which would have disqualified them *or to misconduct of a juror in making an independent inspection of the property in question contrary to the court's instructions.*" (Italics supplied.) The trial court did not err in considering the testimony of Hope and the four other jurors questioned at the hearing because it was admitted for the purpose of showing misconduct of a juror.

Defendant contests the trial court's consideration of a number of items of evidence on the grounds that they are hearsay or were never admitted into evidence. We decline to rule on these matters because we believe that, even if it considered such evidence, the trial court erred in granting a new trial.

■ The first of the two grounds that the trial court relied upon in its order for a new trial is that while the jury was separated pursuant to Rule 47.03, Rules of Civil Procedure, juror Hope had ridden in a car three times and had reflected on the width of the headlight beams and that he mentioned his observation to the other jurors. We do not believe that these facts merit a new trial. Casual observations taken while a juror is going about his ordinary business can be expected in many situations. It would be totally unrealistic to expect a juror, while out of the jury room, to purge his consciousness of any and all reflections upon the trial at hand—an event which to him is an extraordinary and rare occasion. A decision to that effect would make any trial judge or attorney reluctant to allow a Rule 47.03 separation. We hold that a juror's conscious observation of the width of the headlight beams while on a journey incident to the juror's ordinary affairs during separation does not constitute misconduct. Nothing in this decision reflects upon the cases where a new trial was ordered because a juror made a deliberate inspection of an area to ascertain damages or to prove a witness' testi-

mony.[5] However, it should be noted that not every unauthorized view will overturn a verdict.[6]

■ The second ground the trial court relied upon in granting a new trial was that juror Hope was biased due to his knowledge of a similar accident which befell an acquaintance. Mr. Hope was not asked any voir dire question which could be expected to elicit a response concerning the prior accident. A trial court is not justified in ordering a new trial simply because a peremptory challenge might have been exercised had the attorney elicited certain information on the voir dire examination. Verdicts are not so delicate as to be vulnerable to a post-trial voir dire under the circumstances in this case.[7]

Moreover, evidence of this sort should not be admitted for the purpose of overturning a verdict. Many jurors will have personal experience with factual settings similar to the case in which they sit in judgment. To render their verdicts susceptible to impeachment on such grounds would be to expose all verdicts to constant attack founded only in speculation and conjecture. The trial court should not have considered evidence which only demonstrates that the juror knew someone involved in a similar accident and which, if discovered on voir dire, might have motivated the attorney for the plaintiff to exercise a peremptory challenge.

■ We have reversed this decision because the trial court abused its discretion by granting a new trial. The actions of plaintiffs' attorneys in questioning the jurors in no way affected the outcome. Therefore, this is an appropriate place to set forth guidelines to follow in future litigation. We reiterate what we

---

[5] See, e. g., Spinner v. McDermott, 190 Minn. 390, 251 N. W. 908 (1933).

[6] See, City of Bloomington v. Vinge, *supra*; Briggs v. Chicago G. W. Ry. Co. 248 Minn. 418, 80 N. W. 2d 625 (1957); Kime v. Koch, 227 Minn. 372, 35 N. W. 2d 534 (1949); Thoreson v. Quinn, 126 Minn. 48, 147 N. W. 716 (1914); Lyons v. Dee, 88 Minn. 490, 93 N. W. 899 (1903).

[7] See, Weber v. Stokely-Van Camp, Inc. 274 Minn. 482, 144 N. W. 2d 540 (1966); State v. Jackson, 275 Minn. 462, 147 N. W. 2d 689 (1967); State v. Polk, 263 Minn. 209, 116 N. W. 2d 540 (1962).

said in Schwartz v. Minneapolis Suburban Bus Co. 258 Minn. 325, 328, 104 N. W. 2d 301, 303 (1960):

"* * * [W]e are of the opinion that it is undesirable to permit attorneys or investigators for a defeated litigant to harass jurors by submitting them to interrogation of this kind without more protection for the ascertainment of the facts than appears in this case. We do not wish to encourage or approve the practice of so doing. Cases may and do arise where a juror's untruthful answering of questions propounded upon a voir dire examination will prevent a litigant from having a fair trial. Where such cases arise, and the facts come to light after the rendition of a verdict, some method of obtaining relief obviously should be available. However, rather than permit or encourage the promiscuous interrogation of jurors by the defeated litigant, we think that the better practice would be to bring the matter to the attention of the trial court, and, if it appears that the facts justify so doing, the trial court may then summon the juror before him and permit an examination in the presence of counsel for all interested parties and the trial judge under proper safeguards. If that were done, a situation such as we have here could not arise. A record then could be made which could be presented to this court if any doubt existed about the correctness of the trial court's ruling after such hearing."

The time that a verdict loser should approach the court to request a Schwartz hearing should be when the first suspicion of misconduct arises. Nothing should prevent the trial court from ordering a Schwartz hearing on the grounds of an oral assertion by counsel or hearsay affidavit.

A defeated litigant's attorney should never interrogate a juror or telephone him for the purpose of gathering evidence for a request for a Schwartz hearing. Nor should an attorney have an investigator do this on his behalf. The trial courts should use their discretion and good judgment to prevent the necessity of such actions and should be liberal in granting a hearing.

Many cases may arise where there is utterly no suspicion of jury misconduct. It may be argued that in such situations a Schwartz hearing is possible only after a juror has been contacted by the losing party. The answer to this argument is simply that attorneys should not be allowed to contact and harass jurors who render verdicts of a nonsuspicious nature.

We do not feel that it is improper for attorneys to question jurors who take the initiative of approaching or telephoning the attorney to report what they consider misconduct.

It is hoped that this explanation of the Schwartz hearing will end the practice of attorneys contacting jurors in hopes of impeaching the verdict.

The order granting a new trial is reversed.