STATE of Minnesota, Respondent,

v.

**Richard G. HICKS, Appellant.**

**No. C6-88-263.**

Court of Appeals of Minnesota.

Dec. 6, 1988.

Review Denied Jan. 26, 1989.

---

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas L. Johnson, Hennepin Co. Atty., Vernon E. Bergstrom, Chief, Appellate Section, Michael Richardson, Asst. Co. Atty., Minneapolis, for respondent.

C. Paul Jones, State Public Defender, Marie L. Wolf, Asst. State Public Defender, Minneapolis, for appellant.

Heard, considered and decided by FOLEY, P.J., and NORTON and FLEMING, JJ.

## OPINION

FLEMING, Judge.

Appellant Richard Hicks was convicted of first degree burglary, aggravated robbery, and first degree criminal sexual conduct after a jury trial. He appeals, challenging the validity of the convictions and the propriety of the sentencing. We affirm the conviction and the trial court's sentences.

## FACTS

On January 19, 1987, C.B. was at home with her 11–year–old daughter. At 11:00 a.m., the back doorbell rang and C.B.'s daughter answered the door. A black male asked for a man named James. C.B.'s daughter told him that no one named James lived there, and the man left. The

man then went to the front door and rang the doorbell. C.B. answered the door and the same man asked if James lived there. When she told him that no one named James lived there, the man left.

About one minute later, the front doorbell rang again. When C.B. opened the door, the same black male was standing, holding a knife. He forced his way into the home and demanded money. The man then dragged C.B. up the stairs to her bedroom. He saw C.B.'s daughter talking on the phone. He told her to get off the phone and pulled out an electrical cord. He closed the bedroom door and raped C.B. She kept her eyes closed during the assault. Afterwards, the man ordered C.B. to lie on her stomach and put the knife on her buttocks and ordered her to keep her eyes closed and remain motionless. The man then left.

After dialing a wrong number, C.B.'s daughter finally phoned 911 and told the police there was a man in their house. The police arrived a few minutes after the man left. C.B. described the man as black, 20–25 years old, approximately six feet tall, weighing about 160 pounds. He was wearing a red jacket with a blue stripe, jeans and a blue and black scarf around his neck.

C.B. was taken to Hennepin County Medical Center, where she underwent a sexual assault examination. On January 30, C.B. was asked to look at photographs. She looked at between 15 and 20, but could not identify any of them as the assailant. C.B. distributed a flyer throughout her neighborhood warning people about what had happened and urging them to take precautions.

On February 19, appellant went to a home two blocks from his own looking for a friend named Peter. A woman answered the door, and when he asked if Peter was at home, she told him to get away before she called the police. On his way home, appellant was arrested. At the station, appellant told the police that on January 19 he was at King's Supermarket sometime between 10:00 and 11:00 a.m.

After the arrest, the police obtained a search warrant for appellant's home. A blue jacket with red stripes and a long black scarf was discovered. No red jacket, knife, or any of C.B.'s possessions were found.

Appellant was charged with one count of first degree burglary, one count of aggravated robbery, and two counts of first degree criminal sexual conduct.

On February 20, a line-up was held at Hennepin County jail. C.B. and her daughter attended, viewing from separate rooms. C.B. identified appellant as matching the "physical characteristics" of her assailant. C.B.'s daughter first could not identify appellant, but later identified him when he spoke. Neither identified the jacket and scarf taken from appellant's home. At trial, both C.B. and her daughter identified appellant as the assailant.

Appellant testified at trial. He stated that on January 19 he woke at 8:00 a.m. and shovelled snow in his driveway. He went back to bed and reawakened at around 10:30. Appellant went to the King's Market, located a couple blocks from his home, to pick up cigarettes and candy. He was wearing a brown tweed coat. While there he met a friend, Gerald Gill. Gill gave him a marijuana joint and appellant went home, arriving between 11:05 and 11:10. Appellant testified that he had never before seen C.B., but did recall seeing her daughter on a city bus.

Appellant's friend, Mark Clark, testified that appellant had called him on January 19 at about 10:50 a.m. and asked him to pick up some items from the store. Gill testified that he had seen appellant near the supermarket between 10:00 and 11:00 the morning of January 19, and he was wearing a long brown coat that day.

Appellant's mother testified that appellant owned two coats, neither of which was red with a blue stripe. She also testified that the scarf found in appellant's home belonged to children who were staying with her after their house burned down on February 8.

An expert from the Minnesota Bureau of Criminal Apprehension testified as to tests he performed on semen samples found on

C.B.'s nightgown. Secreter grouping tests revealed that C.B. was a Type A secreter, appellant was a nonsecreter, and that the semen came from a nonsecreting person. The expert also performed an enzyme test. The expert concluded that the tests done could not exclude appellant as the person who deposited semen on C.B.'s nightgown. The jury found appellant guilty of first degree burglary, aggravated robbery, and first degree sexual conduct.

After the trial, the Hennepin County Public Defender's office polled the jury and learned that one of the jurors had drawn a map of the area, which allegedly played some part in convincing some jurors that appellant had committed the crime. Defense counsel filed a motion for a new trial or alternatively for a *Schwartz* hearing. The trial judge denied the motion.

Appellant was sentenced to a term of 95 months for the first degree criminal sexual conduct conviction, and 49 months (to be served concurrently) for the burglary conviction. Appellant was not sentenced on the robbery conviction.

### ISSUES

1. Did the trial court properly deny appellant's *Schwartz* hearing request?

2. Was the evidence presented sufficient to convict appellant?

3. Was the trial court's sentence proper?

### ANALYSIS

1. Appellant claims that the trial court erred by denying a post-trial hearing pursuant to *Schwartz v. Minneapolis Suburban Bus Co.*, 258 Minn. 325, 104 N.W.2d 301 (1960). Defendant claims a *Schwartz* hearing was necessary to determine whether the jurors were biased.

Minn.R.Crim.P. 26.03, subd. 19(6) governs jury deliberations in criminal matters. When defense counsel becomes concerned that the verdict may be impeached, he shall move the court for summary hearing. Minn.R.Crim.P. 26.03, subd. 19(6) provides:

**(6) Impeachment of verdict.** Affidavits of jurors shall not be received in evidence to impeach their verdict. If the defendant has reason to believe that the verdict is subject to impeachment, he shall move the court for a summary hearing. If the motion is granted, the jurors shall be interrogated under oath and their testimony recorded. The admissibility of evidence at the hearing shall be governed by Rule 606(b) of the Minnesota Rules of Evidence.

The defendant must show actual misconduct resulting in prejudice. *State v. Henderson*, 355 N.W.2d 484, 486 (Minn.Ct. App.1984). Where a jury has made experiments or taken unauthorized views, through the use of prejudicial evidence, then a mistrial is appropriate. *See Olberg v. Minneapolis Gas Co.*, 291 Minn. 334, 340, 191 N.W.2d 418, 423 (1971). The granting of a *Schwartz* hearing lies in the discretion of the trial court. *State v. Rainer*, 411 N.W.2d 490, 498 (Minn.1987).

In *Rainer*, the Minnesota Supreme Court cited with approval decisions from other jurisdictions holding that experimentation with weapons in evidence and reenactments of incidents by the jury are permissible. *Id.* at 498–99. In the present case, appellant alleges the jury foreman drew a map of the area of the assault. Appellant alleges the map was certainly not drawn to scale and was most likely misleading or inaccurate. Appellant cites two interviews with jurors which indicate that jurors relied on the map.

Respondent has cited two cases which indicate that a jury's reliance on a map drawn by one of the jurors does not constitute misconduct justifying a new trial. In *Wagner v. Doulton*, 112 Cal.App.3d 945, 169 Cal.Rptr. 550 (2nd Dist.1980), the court held that "it is not misconduct for a juror to make a diagram in the jury room * * *." *Id.* at 950, 169 Cal.Rptr. at 552. The *Wagner* case also relied on an older Kansas case, *State v. Keehn*, 85 Kan. 765, 118 P. 851 (1911). In *Keehn*, the Kansas Supreme Court held:

The sketch complained of was not a foreign evidentiary document * * *. It represented nothing more than [the ju-

rors'] idea of what the testimony disclosed. This idea he could present to the jury without misconduct; and the fact that the sketch was not accurate does not indicate misconduct.

*Id.* at 769, 118 P. at 855.

The jury was presented with evidence of the addresses of the accused and the victim. Jurors were selected from the same city in which both parties lived. With a 12-person jury, it is likely that at least one juror would have first-hand knowledge of the neighborhood in which the alleged crime occurred. *See Olberg v. Minneapolis Gas Co.*, 291 Minn. 334, 342, 191 N.W.2d 418, 424 (1971) (noting that many jurors have personal experience of factual settings similar to the case in which they sit). It would therefore be likely that jurors possessing knowledge of the area of the assault would describe or even draw the area for other jurors. The trial court properly denied appellant's motion for a *Schwartz* hearing relative to jury misconduct caused by the drawing of a map.

2. Appellant contends the evidence presented at trial was insufficient to convict him beyond a reasonable doubt. In *State v. Bias*, 419 N.W.2d 480 (Minn.1988), the Minnesota Supreme Court discussed the general standard of review on a claim of insufficient evidence in a criminal case. There, the court stated:

> We must determine whether, under the facts in the record and any legitimate inferences that can be drawn from them, a jury could reasonably conclude the defendant was guilty of the offense charged. We must view the evidence in a light most favorable to the prosecution and assume the jury believed the State's witnesses and disbelieved any contrary evidence.

*Id.* at 484 (citations omitted).

At trial, appellant was positively identified by both C.B. and her 11-year-old daughter. This evidence is the crux of the state's case.

In *State v. Burch*, 284 Minn. 300, 170 N.W.2d 543 (1969), the Minnesota Supreme Court discussed factors to be considered in assessing the reliability of eye-witness testimony. These factors include:

(1) The opportunity of the witness to see the defendant at the time the crime was committed;

(2) The length of time the person committing the crime was in the witness view;

(3) The stress the witness was under at the time;

(4) The lapse of time between the crime and identification; and

(5) The effect of the procedures followed by the police, either testing identification or simply reinforcing the witness initial determination that the defendant committed the crime.

*Id.* at 315–16, 170 N.W.2d at 553–54.

C.B. had a clear view of appellant at the time the crime was committed. The crime took place over the course of several minutes. Although C.B. was certainly under tremendous stress during the rape, prior to that her stress was lower. The line-up was held on February 20, a month and a day after the assault. Finally, appellant has not alleged any facts which indicate the police method of identification (line-up) was suggestive or unfair. Although the defendant presented alibi evidence through his testimony and that of others, the jury was free to disbelieve it. *See State v. Berry*, 309 N.W.2d 777, 784 (Minn.1981).

In light of the direct identification of appellant by the victim, the jury's verdict is proper.

3. Appellant was sentenced to 49 months for the burglary conviction and 95 months for the criminal sexual conduct charge. The sentences were to be served concurrently. Pursuant to the state's motion, appellant was sentenced pursuant to *State v. Hernandez*, 311 N.W.2d 478 (Minn. 1981) (providing that sentencing on same day for three convictions based on separate offenses *not* part of the same course of conduct involving different victims, could properly consider first two convictions when sentencing defendant on third conviction). Appellant's criminal history score was increased from 3 to 4 by the burglary

conviction, and he was *then* sentenced for the criminal sexual conduct conviction.

■ Minn.Stat. § 609.585 (1986) authorizes this form of sentence. Section 609.-585 expressly permits prosecution and conviction and sentencing for a second crime committed during a burglary. *See State v. Van Gorden,* 326 N.W.2d 633 (Minn.1982).

Appellant claims the trial court's sentence was improper, and cites *State v. Eberhardt,* 379 N.W.2d 242 (Minn.Ct.App. 1986), *pet. for rev. denied* (Minn. Feb. 19, 1986). *Eberhardt* also involved convictions of burglary and criminal sexual conduct, where the defendant's criminal history score was increased from 3 to 4 by the burglary conviction and the increased score was used as the basis for an increased sentence on the criminal sexual conduct conviction. In reversing the trial court, this court noted two grounds. First, Minnesota Sentencing Guidelines Comment II.B.102 provides:[1]

> When multiple current convictions arise *from a single course of conduct* and multiple sentences are imposed on the same day pursuant to Minn.Stat. § 609.585 or 609.251, the conviction and sentence for the "earlier" offense should not increase the criminal history score for the "later" offense.

(Emphasis added). However, the present case involves multiple courses of conduct. Second, in *Eberhardt,* the state *conceded* the impropriety of the trial court's sentence. In the present case, the state has made no such concession.

The facts in this case are not unlike those in *State v. Edwards,* 380 N.W.2d 503 (Minn.Ct.App.1986).

■ The appellant's acts of burglarizing and raping the victim were not a part of the same course of conduct. Here the appellant robbed the victim on the main floor of the house and then dragged her upstairs where he raped her. As in *Edwards,* the appellant's objectives were twofold: to take the victim's money and to sexually assault her. Therefore, the burglary conviction was properly used to increase appellant's criminal history score under the *Hernandez* method of sentencing.

### DECISION

Appellant's conviction of first degree burglary, aggravated robbery and first degree criminal sexual conduct and the trial court's subsequent sentences are affirmed.

AFFIRMED.

---

1. This language was added to the sentencing guideline comments on November 1, 1983, two years after the supreme court's decision in *Hernandez.* *See* Knapp, *Minnesota Sentencing Guidelines and Commentary Annotated* at 18 (1985).