**STATE of Minnesota, Respondent,**

v.

**Harry J. EVANS, Appellant.**

No. A06–821.

Supreme Court of Minnesota.

Oct. 23, 2008.

Rehearing Denied Dec. 5, 2008.

Lawrence Hammerling, Chief State Appellate Public Defender, Lydia Villalva Lijó, St. Paul, MN, for appellant.

Lori Swanson, Attorney General, St. Paul, MN; and Susan Gaertner, Ramsey County Attorney, Mitchell L. Rothman, Assistant County Attorney, St. Paul, MN, for respondent.

## OPINION

G. BARRY ANDERSON, Justice.

After a jury trial in Ramsey County District Court, appellant Harry J. Evans was found guilty and convicted of first-degree murder in violation of Minn.Stat. § 609.185(a)(4) (2006). Evans appealed to this court, making a number of arguments, including a claim that his right to a fair trial by an impartial jury was violated because the district court failed to investigate a telephone caller's tip that a juror was racially biased. Because the record did not include adequate information about the telephone caller's tip and because of our concern about the potential for juror bias, we retained jurisdiction and remanded to the district court with instructions to release the information about the telephone caller to the parties so that they could conduct an investigation and, if warranted, move for additional proceedings on the issue of juror bias. After remand, the defendant conducted an investigation and moved for a *Schwartz*[1] hearing. The district court granted the motion, conducted the hearing, and denied Evans's motion for a new trial. The case has now returned to us with a complete record related to the telephone caller's tip and the proceedings that took place after remand. After a careful review of the record related to this issue, as well as all of the other issues that Evans has raised on appeal, we affirm.

This case arises from the death of St. Paul Police Sergeant Gerald Vick. The evidence produced at trial reveals the following. St. Paul Police Sergeants Joseph Strong and Gerald Vick were partners in the vice unit. At approximately 10:30 p.m. on May 5, 2005, Strong and Vick went to Louie's Bar on Payne Avenue to investigate individuals who were suspected of engaging in prostitution. Strong and Vick were casually dressed, and while they were at the bar they consumed alcohol so that they would fit in with the other patrons.[2] Strong and Vick engaged two suspected prostitutes in conversation, and the women suggested playing pool at Erick's Bar. Strong and Vick welcomed the opportunity to go to Erick's with the women because the officers otherwise could not easily enter Erick's without attracting attention to themselves. Strong and Vick each drove separately to Erick's Bar in assigned unmarked police cars. They arrived at Erick's about midnight or 12:30 a.m., ordered some alcoholic drinks, and began playing pool.

Although Strong and Vick concluded that their prostitution investigation would not yield any arrests that night, they did not leave Erick's. Instead, Strong and Vick stayed at the bar to socialize with patrons so that they could less conspicuously enter the bar in the future and to look for any other signs of illegal activity. They stayed until closing time, about 1:45 or 2 a.m., when the employees started asking patrons to leave.

After they left Erick's, Strong and Vick stood by Strong's car for a few minutes talking about their work the next day. While they were talking, Strong observed a tall black male who appeared to be extremely intoxicated; Strong later identified the man as Antonio Kelly.[3]

---

1. *See Schwartz v. Minneapolis Suburban Bus Co.*, 258 Minn. 325, 104 N.W.2d 301 (1960).

2. Strong and Vick had also consumed alcohol earlier in the evening while conducting an undercover investigation of a possible case of prostitution. Throughout the evening, Strong and Vick paid for the alcoholic drinks with funds provided by the police department.

3. Kelly testified that earlier that evening he and Evans together had consumed half a pint of gin, and they had each had two or three beers before they went to Cab's Bar. At Cab's,

Kelly stopped outside of Erick's and began to urinate near the building. While Vick was talking with Strong, the officers observed Kelly urinating in public, and Vick shouted at Kelly "to move on, to keep walking." Strong said that Vick reacted to Kelly because Vick was concerned about public intoxication and public urination in that area of St. Paul, where there had been numerous complaints about quality-of-life crimes. But Kelly did not move along in response to Vick's directive. Instead, Kelly approached Strong and Vick.

When Kelly was approximately 15 feet from Strong and Vick, the officers noticed another black male who was "smaller in stature, rounder, [with] shorter hair"; Strong later identified this individual as Evans. Evans was saying something to Kelly, so Strong and Vick identified Evans as a friend of Kelly's. Strong and Vick told Evans to "get your friend and get him out of here." Evans and Kelly did not respond, so Strong and Vick used stronger language and told Evans and Kelly to leave the area. Evans tried to convince Kelly to leave, and it appeared to Strong that Evans was trying "to drag [Kelly] along." Eventually, Evans and Kelly began to move away from the area. Before Evans and Kelly began to move away, however, Evans made a gesture by reaching for his waist and raising his shirt. Based on his experience as a police officer, Strong understood Evans's gesture to be a threat, indicating either that Evans had a gun or that he could get a gun. Vick then raised his shirt, in what Strong described as a "mocking gesture," and said "so

what." But Vick did not show Evans and Kelly his gun.

Strong and Vick then finished their conversation about what they were going to do the next day, and Strong got into his car and began to drive away. As he was driving away, Strong stopped at a stoplight. Kelly then reappeared and stepped in front of Strong's vehicle. Kelly stood in front of Strong's left headlight, looking at Strong. Strong rolled down his window and told Kelly to get away from the vehicle. Strong then used a walkie talkie to call Vick for backup. Strong testified that he did this because in his opinion Kelly "was going to be in the area harassing other people" and it was Strong and Vick's job "to make sure he was on his way." Shortly thereafter, Vick drove up "on the sidewalk." At that time, Strong noticed Evans was there as well.[4] Vick shouted at Kelly and Evans, telling them to leave the area, and Strong testified that Vick began "pushing" Kelly and Evans—in other words, Vick was running toward them making noise and stomping his feet to let them know that he was behind them and that he wanted them to leave the area. Strong was also pushing Kelly and Evans. He was approximately 5 to 7 yards behind Vick.

Strong testified that he and Vick kept pushing Evans and Kelly until Strong "heard three to four shots." Strong then "saw Sergeant Vick turn slightly clockwise and continue going down onto the alley, onto the ground," and Strong knew that Vick had been shot. Strong saw that Evans was the person closest to Vick, and Strong testified that Evans was "the per-

---

Kelly continued to drink: he had "[a] couple Yager Bombs [ (Jägermeister liquor with Red Bull) ], a beer, and ... a couple of shots." When Cab's closed, Kelly and Evans went to Erick's Bar and tried to get in because Kelly wanted something else to drink, but the two were refused admission.

4. According to Kelly, when Vick drove up on the sidewalk, Evans fired one shot, hoping he would stop the car. This testimony was uncorroborated by any other testimony or evidence.

son that was capable of shooting Sergeant Vick." Strong did not see Kelly after the shots were fired. Strong fired his weapon at Evans eight to ten times, but Evans ran through a yard and out of Strong's view.

After Evans ran away from Strong, Strong returned to Vick and called for backup. When the other officers arrived, Strong gave the officers descriptions of the suspects and told them the direction that Evans had fled.

Vick was then taken to the hospital, where he died later that morning. At trial, the Ramsey County medical examiner testified that Vick had died due to loss of blood from three gunshot wounds. The examiner testified that the third shot was fired at close range, and that the shooter was a matter of inches from Vick.

Kelly testified at trial for the State. Kelly said that after he heard the shots, which he "assumed" came from Evans, he "took off." Kelly ran "[n]ot even a half block" and hid in bushes by a garage. When Kelly saw Evans, he called out to him, and they hid together in the bushes. Evans told Kelly, "I got him, I think I got one." Evans and Kelly hid on a porch for about 10 or 15 minutes, and Kelly saw Evans throw the gun over the side of the porch.

Kelly then got up and started walking toward home. Kelly walked past some police officers that were in the vicinity. Because Kelly matched the description given by Strong and corroborated by a 3M security videotape that had recorded a portion of the confrontation between Vick and Strong and Kelly and Evans, the officers handcuffed Kelly, arrested him, put him in a squad car, and took him downtown to police headquarters.

At approximately 6 a.m. on May 6, the police arrested Evans about 3 to 4 blocks from the location of the shooting. Evans matched the description given by Strong and corroborated by the 3M security videotape.

In addition to Strong and Kelly, J.M. also testified as a witness to the shooting. Along with his parents,[5] J.M. was traveling home from a visit to Regions Hospital about 2 a.m. on May 6. J.M., who was in the passenger seat of the car, testified that while their car was stopped at a stoplight, he observed, across the intersection, a tall black man standing in front of another car stopped at the stoplight. J.M. testified that when the tall black man moved away from the sidewalk toward an open lot, the "car jumped the curb."[6] The driver of the car then got out and started chasing both the man who had been standing in front of the car and his shorter companion. J.M. testified that he saw the shorter man trip and fall, and when the shorter man got up J.M. saw him pull a gun from his pants. J.M. testified that he saw the shorter man shoot the man who was chasing him, and that the shorter man was only "[a] matter of feet" from the man whom he shot. J.M. also testified that the taller man was approximately 20 yards away from where the shooting took place.

Several other pieces of evidence also tied Evans to the shooting. For instance, the police found a .38–caliber revolver outside a residence near the scene of the crime. The bullet recovered from Vick's body was a .38–caliber bullet. Four .38–caliber shell casings were also recovered near the scene of the crime. A .38–caliber cartridge was found in a pair of jeans on the living room floor at Evans's residence. Additionally, DNA testing of the trigger,

5. J.M. was 38 years old at the time of trial.

6. J.M.'s testimony indicated that there was only one car at the scene.

the ejector rod, and the cylinder release of the revolver revealed a mixture of DNA from two or more individuals. Kelly and Vick were excluded as possible contributors, but Evans could not be excluded.

At trial, the defendant argued that Kelly—not Evans—was the shooter. The defendant also argued that Strong and Vick were not on duty that night. In particular, the defendant questioned how Strong and Vick could have been on duty-an element of the charged crime—if they were (at least in Vick's case) legally intoxicated.[7]

The jury found Evans guilty of first-degree murder, in violation of Minn.Stat. § 609.185(a)(4). The district court sentenced him to life in prison without the possibility of release. Evans appealed his conviction to this court, arguing that (1) his right to a fair trial by an impartial jury was violated because the district court failed to investigate a telephone caller's tip that a juror was racially biased; (2) his right of confrontation was violated when the court conducted an inadequate review of J.M.'s medical records and limited the defendant's ability to cross-examine J.M.; (3) the district court erroneously instructed the jury that Evans need not have known or have had reason to know that the victim was a peace officer; (4) the district court erred when it did not issue

an accomplice instruction; and (5) Evans's right to a fair trial was violated because of "continual presentation of 'spark of life' evidence." Evans also makes a number of arguments in a pro se supplemental brief.

## I.

We turn first to Evans's argument that he was denied his right to a fair trial by an impartial jury because one of the jurors was racially biased. On January 12, 2006, the second day of testimony at trial, the court received a telephone call "from someone who had some allegations about racism to make against one of [the] seated jurors." The court instructed her clerk to call the person back, which the clerk did, and then the clerk related the information received from the caller to the court. The court in turn communicated the information to the attorneys and told them that the only information the court had about the caller was her name, "Kathy," and her telephone number. The court also gave the attorneys the name of the juror alleged to be racist.[8]

After an overnight break, the defendant asked the district court to investigate the complaint (with the help of either the Bureau of Criminal Apprehension (BCA) or the police department from another coun-

---

7. The medical examiner concluded that Vick had a blood-alcohol concentration of .20% at the time of his death. Strong was administered a blood-alcohol test at police headquarters at approximately 6:30 a.m., several hours after the shooting took place. The test indicated that he had a blood-alcohol concentration of approximately .01%. Extrapolating back in time, the results of the test indicate that Strong's blood-alcohol concentration would have been about .09% when he left Erick's Bar. (At the time of the shooting, a person could not legally operate a motor vehicle with a blood-alcohol level of .10% or more. *See* Minn.Stat. § 169A.20 (2004).) Strong testified that the results of the test surprised him because he did not "feel like a point 09." He

also testified that he was "[v]ery much" surprised to hear that Vick's blood-alcohol concentration was .20%, because Vick was not staggering, slurring, or exhibiting other signs that Strong would expect a person at .20% to exhibit.

8. This exchange between the district court and the attorneys took place off the record. When we initially received this case, the juror at issue was not definitively identified and the exact information given by the caller did not appear in the record. Only the caller's first name and the fact that she had given her telephone number to the court, could be determined from the record.

ty) to "make [a] discreet inquiry of [the caller] to determine the person's credibility and whether there is anything more that should be pursued in this area and bring the information back to us." In the alternative, the defendant asked the court to allow the defendant to conduct its own investigation. The defendant was particularly concerned that the juror allegedly made remarks such as "[Hurricane] Katrina was God's way of killing the n———s."

The district court said that it was concerned about "the operation and the integrity of our jury service" and the potential "effect of encouraging people to call in with false ... accusations or anything they know about jurors." The court also noted, however, that "this may be [the] subject of a *Schwartz* hearing later." Eventually, the court labeled the defendant's request "a motion for me to give you that phone number," and denied the motion.

After trial, the defendant filed a written motion for disclosure of information about the telephone caller. In its memorandum supporting the motion, the defendant made it unequivocally clear that it was not requesting a *Schwartz* hearing "since defense believes it is premature to make such a request." The district court denied the motion, attaching a memorandum which noted, in particular, a concern about "paralyz[ing] the jury system."

■ After oral argument, we remanded to the district court for further proceedings. Our decision to remand was based on constitutional principles. Under both the United States Constitution and the Minnesota Constitution, criminal defendants are guaranteed due process rights to a fair trial and an impartial jury. U.S. Const. amend. VI, XIV; Minn. Const. art. I, §§ 6, 7; *see State v. Bowles*, 530 N.W.2d 521, 536 (Minn.1995). Because "[t]he impartiality of the adjudicator goes to the very integrity of the legal system," we have recognized that "[t]he bias of a single juror violates the defendant's right to a fair trial." *State v. Brown*, 732 N.W.2d 625, 630 (Minn.2007). We have also held that the presence of a biased fact finder constitutes structural error, which requires automatic reversal. *State v. Dorsey*, 701 N.W.2d 238, 252–53 (Minn.2005). Finally, we have said that a juror's racist comment to other jurors during the course of a trial (even if outside the trial proceedings) implicates the defendant's due process rights to a fair trial and an impartial jury. *See State v. Varner*, 643 N.W.2d 298, 304–05 (Minn.2002).[9] Because the record on appeal did not include adequate information about the telephone caller's tip and because of our concern about the potential for juror bias, we retained jurisdiction and remanded to the district court with instructions to release the information about the telephone caller to the parties so that they could conduct an investigation and, if warranted, move for additional proceedings on the issue of juror bias.

In reaching our decision to remand, we examined both the district court's decision during trial to deny the defendant's motion

---

9. In *Varner*, during a break in the defendant's trial, the defendant's cousin overheard one juror say to other jurors that it was considered a miracle "if you were to walk down that street [in the neighborhood where the crime was committed] being a white person and if you were not either beat up or robbed." 643 N.W.2d at 302. We concluded that "Rule [of Criminal Procedure] 26.03, subdivision 9, required the trial court to question the jurors

about their exposure to [the other juror's] comment." *Id.* at 305; *see also* Minn. R.Crim. P. 26.03, subd. 9 ("If it is determined that material disseminated outside the trial proceedings raises serious questions of possible prejudice, the court may on its initiative and shall on motion of either party question each juror, out of the presence of the others, about the juror's exposure to that material.").

for access to the caller's information and the court's ruling on the defendant's post-trial motion. Although the defendant had not explicitly requested a *Schwartz* hearing prior to the remand, the defendant's post-trial motion explicitly stated that it was made "to determine if a prima facie case can be made to obtain a *Schwartz* hearing." The defendant's motion at trial was presumably made for the same reason. Because of the way the defendant's motion was phrased, it was not immediately clear which standard appropriately guided our review of the district court's decision to deny the defendant's motion. We concluded, however, that because we review denials of motions for *Schwartz* hearings for abuse of discretion, it was appropriate in this case to review the district court's decision on the defendant's motions for disclosure of information about the telephone caller under an abuse-of-discretion standard. *See State v. Larson,* 281 N.W.2d 481, 484 (Minn.1979).

■ We turned first to the motion made during trial. The district court denied this motion, expressing concern that such an investigation during trial based on a telephone call would be disruptive of the jury system. The district court's concern was well-founded. The law should not encourage people to call courts with false accusations about jurors, and a district court should not be required to halt a trial already in progress to conduct an investigation every time the court receives a telephone tip about a juror. In light of these principles, we concluded that the district court did not err when it denied the defendant's motion at trial to disclose the information about the caller.

But the post-trial motion is a different matter. Concerns with disruption of the jury system must be weighed against a defendant's rights to a fair trial and an impartial jury. Because the record lacked

information about what the telephone caller said and which juror was at issue, and because the caller left both a name and a phone number, giving her more apparent credibility than a completely anonymous caller, we concluded that the district court abused its discretion when it denied the defendant's post-trial motion to disclose information about the caller. We therefore remanded to the district court with instructions to provide to the parties any information that the court possessed related to the telephone caller so that the parties could inquire further about the allegation of juror bias.

## II.

We now turn to Evans's arguments that upon remand (1) the State violated *Schwartz* hearing procedure by contacting the juror after the hearing was granted, and (2) that the district court's findings of fact were erroneous. We begin our analysis with a summary of the proceedings on remand.

On remand, the district court gave both parties the law clerk's notes, the transcript of both the juror's voir dire, and the juror's questionnaire, and telephone records requested by the district court. The telephone caller was located and interviewed, and Evans subsequently moved for and was granted a *Schwartz* hearing.

At an administrative hearing on September 20, 2007, the district court decided to issue subpoenas directly to *Schwartz* hearing witnesses. After editing a subpoena cover letter proposed by Evans's counsel, the court instructed the parties to work together and submit additional changes. On September 21, Evans's counsel requested that the district court add to the subpoena cover letter the following language, which had been discussed and agreed upon by both parties:

You are directed not to discuss with anyone the fact that you have received this subpoena or your participation in this matter. However, you may speak with the attorneys working on this case or with persons who are working with the attorneys if you are contacted by them and if you wish to speak with them.

The district court mailed subpoenas along with the revised cover letter on September 26 to five witnesses, including the juror.[10] Evans's counsel received a copy of the letter that had been mailed to the juror, but did not object in the district court to its content or to the fact that the juror received the letter. On October 4, the Ramsey County Attorney and a BCA agent interviewed the juror at the Ramsey County Attorney's office.

The *Schwartz* hearing was scheduled for the morning of Monday, October 8, 2007. A half-hour before the hearing, Evans's counsel received a copy of the 19–page interview transcript from the State's October 4 interview with the juror; this was counsel's first notice of the interview. Evans's counsel was "outrage[d]" by the late disclosure of the transcript, objected to the juror interview as a *Schwartz* violation, and moved for a continuance. The State conceded that the timing of the transcript delivery was "unfortunate," but said the transcript was dispatched as quickly as possible. The district court denied Evans's motion for a continuance, but granted a recess before the start of the juror's

testimony to allow counsel additional time to read the transcript.

The *Schwartz* hearing proceeded with testimony from C.A., the woman who called the district court. She testified at the *Schwartz* hearing that she worked as a pull-tab vendor at the Lucky Foxx,[11] a neighborhood bar, around the time of Evans's trial in January 2006. She knew the juror as a "regular" who "came in every day of the week."

C.A. testified that the juror and her husband were at the bar on the Monday afternoon following Hurricane Katrina, watching news coverage of the hurricane. As C.A. walked up to the bar, the juror looked at the television screen, looked at C.A., and said, "Isn't it amazing how God works in mysterious ways, how he wiped . . . out a good portion of the n——s off the face of the earth." C.A. said that she was so upset about the comment that she reported it to a coworker and her manager, both of whom confirmed having heard C.A.'s report of the incident. C.A. testified that because the juror told her she was serving as a juror in a "high-profile trial," C.A. reported the Hurricane Katrina comment to the district court within a few days of the incident.[12]

C.A. said that the juror was commonly known at the bar as a racially prejudiced person, and that the juror typically used racial slurs. C.A.'s coworker and manager testified that they believed the juror to be generally prejudiced. Although C.A. usually confronted people when they made

---

10. Aside from minor word rearrangement, the letter contained the identical language requested by Evans's counsel on September 21.

11. The Lucky Foxx was called "Mateyka's" at the time of Evans's trial.

12. C.A. later admitted that the juror never actually said which trial she was serving on,

and she could not recall whether the juror ever made statements about the defendant's guilt or innocence. For her part, the juror denied ever telling anyone, aside from her husband, about serving as a juror on the trial. She assumed that people at the bar suspected her participation in Evans's trial due to the fact that she was on a jury for so long.

offensive comments, she never had a conversation with the juror about making racist remarks.

The juror also testified at the hearing. She said that she has regularly patronized the Lucky Foxx for nearly 40 years, and continued to do so during Evans's trial. The juror denied making the Hurricane Katrina statement and testified that when she first heard about the allegation that she made the racist remark from a news reporter who visited her house in June 2007, she was "dumbfounded," was "in shock," and "almost passed out." The juror also denied using racial slurs or even knowing the meaning of particular slurs, and said that it is inappropriate to use racist language. She further testified that she had good relationships with African–American coworkers and that she enjoyed playing cards with African Americans on Sunday nights at the Lucky Foxx. She admitted that she and other bar patrons had some "bad dealings" with C.A. and other pull-tab vendors, but could not otherwise think of any reason why C.A. would be upset with her.

The juror was also asked about her responses to race-related questions on the juror questionnaire. Question 57 asked, "Have you, or anyone close to you, had any positive or negative experiences with any African American people that would [a]ffect your ability to be a fair and impartial juror in this case?" She answered in the negative. Question 58 asked, "Are there ethnic or racial groups of people which you do not care to associate with?" She answered in the negative. Question 59

asked, "Do you believe that you have ever been the victim of discrimination on the basis of race or color?" She again answered in the negative. The juror testified that she answered "truthfully and completely all questions" on the juror questionnaire.

At the close of the October 8 hearing, Evans moved for a continuance to review the transcript of the juror's interview and investigate whether additional witnesses needed to be called. The court granted the continuance over the State's objection.

When the hearing resumed on October 12, Evans elected not to call any additional witnesses. Over defendant's objection, the State presented five witnesses, all of whom testified that they had never heard the juror make a racist comment, known her to have any difficulties with persons of color, personally had any difficulties with the juror, or felt the object of prejudicial behavior by the juror.[13]

At the conclusion of the October 12 hearing, Evans moved for an order establishing prejudice based on the State's contact with the juror or, alternatively, to strike the juror's *Schwartz* hearing testimony and October 4 statements made to the State. The district court denied the motion.

The defendant also moved for judgment of acquittal or, in the alternative, for a new trial based on C.A.'s description of the juror's Hurricane Katrina comment. The district court denied the motion and found that Evans failed to prove by a preponderance of the evidence that the juror made

13. The State's five witnesses included the Filipino owner of the Lucky Foxx; a frequent patron of the Lucky Foxx who is of mixed African–American and Caucasian race; and three of the juror's coworkers, all of whom are persons of color. Evans objected to the testimony of the State's witnesses because the "continuance was granted for the sole purpose of the defense to have the opportunity to review the 19–page transcript that was provided ten minutes before" the October 8 hearing. Evans argued that the State obtained the information about these additional witnesses by conducting another objectionable interview with the juror.

the racially-biased statement alleged by C.A. or that a racially-biased individual sat on the jury.

Evans argues on appeal that the district court erred in denying both of his motions. We examine each motion in turn.

### A.

Evans first argues that prejudice sufficient to taint the *Schwartz* hearing process should have been presumed when the State contacted the juror, and that he is therefore entitled to a new trial. The State argues that the letter the district court sent to the juror authorized the contact. But, Evans contends, *Schwartz v. Minneapolis Suburban Bus Co.*, 258 Minn. 325, 104 N.W.2d 301 (1960), prohibits an attorney from contacting and questioning a juror after a verdict has been rendered. He argues that the State violated this "firmly established prohibition" by interviewing the juror prior to the *Schwartz* hearing, which caused unfair prejudice to Evans.

The record indicates that the district court mailed the juror a subpoena cover letter instructing her that she may "speak with the attorneys working on this case." Not only did Evans fail to object to this letter, his counsel drafted and submitted the letter to the district court for the court's approval. Evans nonetheless objected at the *Schwartz* hearing to the State's contact with the juror. Because Evans invited the contact of which he later complained, the "invited error doctrine" would preclude him from obtaining relief on grounds of that error. *State v. Goelz*, 743 N.W.2d 249, 258 (Minn.2007) (noting that invited error doctrine "prevents a party from asserting an error ... that he invited or could have prevented"). But we have recognized an exception to the invited error doctrine that allows this court to correct an error that satisfies the doctrine

of plain error. *Id.; State v. Goodloe*, 718 N.W.2d 413, 424 (Minn.2006); *State v. Gisege*, 561 N.W.2d 152, 158 n. 5 (Minn.1997).

█ The plain error doctrine requires a defendant to demonstrate that "(1) there was an error, (2) it was plain, and (3) it affected [his] substantial rights." *Goelz*, 743 N.W.2d at 258. If all three of these factors are established, the reviewing court must decide whether the error seriously affected the fairness and integrity of the judicial proceedings. *State v. Griller*, 583 N.W.2d 736, 740 (Minn.1998) (citing *Johnson v. United States*, 520 U.S. 461, 469–70, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (explaining that a court may exercise its discretion to correct the error only if the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings)). The plain error doctrine applies to a district court's review of post-trial motions. Minn. R.Crim. P. 31.02 (providing that plain error or defects affecting substantial rights may be considered by the court upon post-trial motions). Thus, if Evans demonstrated that the State's contact with the juror was an error that was plain and that affected his substantial rights, and if the district court concluded that the error seriously affected the fairness and integrity of the judicial proceedings, then the district court could have corrected the error notwithstanding Evans's agreement to the letter. We therefore consider whether Evans demonstrated that the State's contact was an error that was plain and that affected his substantial rights.

█ Evans first had to establish that it was an error for the State to contact the juror, and that the error was plain. An error is plain if it "contravenes case law, a rule, or a standard of conduct." *State v. Ramey*, 721 N.W.2d 294, 302 (Minn.2006). Evans contends that *Schwartz* prohibits

juror contact, even after a post-verdict *Schwartz* hearing has been granted.

We spelled out in *Schwartz* the procedure to be used when there is an allegation of juror misconduct. 258 Minn. at 328, 104 N.W.2d at 303. After the *Schwartz* jury returned a verdict against the defendant bus company for causing an automobile accident, the company argued that it was entitled to a new trial based on juror misconduct. *Id.* at 326. 104 N.W.2d at 302. The juror whose conduct was at issue was asked during voir dire examination whether he could be fair and impartial, and he answered in the affirmative. *Id.* at 327, 104 N.W.2d at 302–03. When asked whether he or any member of his family had been involved in an auto accident, he answered in the negative. *Id.,* 104 N.W.2d at 303. After trial, an investigator for the bus company interviewed the juror, who said that 4 years prior to trial his "daughter and her husband, while passengers in a cab, had been injured in an accident only a short distance from" where the *Schwartz* accident took place and that they had recovered damages. *Id.,* 104 N.W.2d at 303. The juror said that his daughter's accident was always on his mind and had influenced him as a juror to favor the *Schwartz* plaintiffs. *Id.,* 104 N.W.2d at 303.

We said in *Schwartz* that "it is undesirable to permit attorneys or investigators for a defeated litigant to harass jurors by submitting them to interrogation ... without more protection for the ascertainment of the facts." *Id.* at 328, 104 N.W.2d at 303. We therefore prohibited "the promiscuous interrogation of jurors by the defeated litigant" when post-verdict information about a juror untruthfully answering voir dire questions comes to light, and said that "the better practice [is] to bring the matter to the attention of the trial court, and, if it appears that the facts justify so doing, the trial court may then summon the juror before him and permit an examination in the presence of counsel for all interested parties and the trial judge under proper safeguards." *Id.,* 104 N.W.2d at 303; *see* Minn. R.Crim. P. 26.03, subd. 19(6).[14] A reviewable record can then be made. *Schwartz,* 258 Minn. At 328, 104 N.W.2d at 303.

Evans argues that *Schwartz* forbids attorneys to initiate communication with jurors in relation to a *Schwartz* hearing, citing *Olberg v. Minneapolis Gas Co.,* 291 Minn. 334, 191 N.W.2d 418 (1971). But in *Olberg* we said that "[a] defeated litigant's attorney should never interrogate a juror ... for the purpose of gathering evidence *for a request for* a *Schwartz* hearing." *Id.* at 343, 191 N.W.2d 418, 191 N.W.2d at 424 (emphasis added). We reiterated the *Olberg* rule in *Baker v. Gile,* 257 N.W.2d 376, 377–78 (Minn.1977), in response to a defeated litigant's counsel contacting three jurors in order to gain information that might establish jury misconduct. In *Baker,* we declined to consider the claim of alleged jury misconduct because "counsel failed to follow the procedure set forth in [ ] *Schwartz* and *Olberg.*" 257 N.W.2d at 378. We instructed "trial courts to decline *petitions for Schwartz* hearings based upon information obtained improperly." *Id.* (emphasis added). We were concerned again about the proper conduct of an attorney *seeking* to impeach a verdict by gath-

---

14. The rule applicable in criminal proceedings provides:

Affidavits of jurors shall not be received in evidence to impeach their verdict. A defendant who has reason to believe that the verdict is subject to impeachment shall move the court for a summary hearing. If the motion is granted the jurors shall be interrogated under oath and their testimony recorded.

Minn. R.Crim. P. 26.03, subd. 19(6). This rule adopts the procedure outlined in *Schwartz.* Rule 26–03, subd. 19(6) cmt.

ering enough evidence to support a *Schwartz* hearing.

On appeal, the State cites *Bianchi v. Nordby*, 409 N.W.2d 835 (Minn.1987), to support its argument that the prohibition against juror contact does not apply once the district court rules on a *Schwartz* hearing request. The defeated plaintiff in that case received information from the jury foreman that the district court misinterpreted the verdict. *Id.* at 836. Plaintiff's counsel sought to have the jury recalled for questioning, but the district court refused and declined to schedule a *Schwartz* hearing. *Id.* Plaintiff's counsel subsequently "contacted the jurors and obtained affidavits from them as to a purported recording error" in the verdict. *Id.* Plaintiff then brought a motion seeking correction of the verdict on the basis of the jurors' affidavits, but the motion was denied due to the plaintiff's failure to follow *Schwartz* hearing procedure. *Id.* at 837–38. We determined on appeal that the district court did not abuse its discretion when it denied a *Schwartz* hearing, but that the district court incorrectly concluded that plaintiff's counsel had violated *Schwartz* hearing procedure

by contacting the jurors. *Id.* at 838. We said that because the district court had already denied the *Schwartz* hearing before plaintiff's counsel contacted the jurors and obtained their affidavits, there was no misconduct. *Id.* *Bianchi* says that the *Schwartz* contact prohibition ends once the district court denies a hearing request, but it does not provide guidance as to the unique situation presented in this case—where a party contacts a juror after the verdict has been rendered and after a *Schwartz* hearing has been granted.[15]

 While we have never prohibited an attorney or investigator from interviewing a juror after a post-verdict *Schwartz* hearing has been granted, we have never approved of such contact.[16] In the absence of case law or a rule [17], and in light of the language in our previous cases, we cannot conclude that the State's contact with the juror was error that was plain. Because Evans failed to prove the plain error exception to the invited error doctrine, we hold that the district court did not err by denying relief.[18]

15. It is improper for counsel to contact a juror during the course of an ongoing trial. Minn. R. Prof. Conduct 3.5(b).

16. Today we neither prohibit nor permit the interrogation of jurors after a motion for a *Schwartz* hearing has been granted. Other practices are possible, and perhaps preferable to those employed by the district court in this case. In light of the extraordinary and unique circumstances present here, we decline to announce a rule to be applied in all future circumstances.

17. The dissent argues that *Schwartz* supports the use of a court hearing requirement for interrogating jurors and also argues that Minn. R.Crim. P. 26.03, subd. 19(6) precludes parties from contacting jurors in a criminal proceeding at any time, not just before a hearing is granted. However meritorious those arguments might be, for purposes of our

proceedings today, neither authority prohibits the interview conducted by the State and on this record we cannot say that the error, if any, was plain.

18. In the alternative, if we were to review the matter, we would affirm the district court. Evans asks us to presume prejudice from the contact. But we "generally do not presume prejudice merely because of a defect in the proceedings." *State v. Martin*, 723 N.W.2d 613, 623 (Minn.2006) (internal quotation marks omitted). Rather, the appellant has the burden of showing that he was prejudiced by the defect. *State v. Wren*, 738 N.W.2d 378, 387 (Minn.2007). In this case, Evans did not show prejudice. We have reviewed the transcript from the State's October 4 interview with the juror, and it does not reflect improper efforts to influence the juror's testimony. Evans likewise established no such tainting of

## B.

 Evans next challenges the district court's conclusion that he is not entitled to a new trial based on C.A.'s allegation of the juror's racist remark. He specifically argues that the district court's findings of fact are clearly erroneous, and that the court ignored critical relevant evidence and erroneously relied on irrelevant information in making its findings of fact. We give great deference to a district court's findings of fact and will not set them aside unless clearly erroneous. *Fletcher v. St. Paul Pioneer Press,* 589 N.W.2d 96, 101 (Minn.1999), *quoted in State v. Gomez,* 721 N.W.2d 871, 883 (Minn.2006). The clearly erroneous standard requires that we be "left with the definite and firm conviction that a mistake has been made." *Gjovik v. Strope,* 401 N.W.2d 664, 667 (Minn.1987). If we find "reasonable evidence to support the [district] court's findings of fact," we will not disturb those findings. *Fletcher,* 589 N.W.2d at 101.

 At a *Schwartz* hearing, the moving party bears the burden of demonstrating actual bias, *State v. Kelley,* 517 N.W.2d 905, 910 (Minn.1994), which refers to "a state of mind on the part of the juror, in reference to the case or to either party, which would prevent the juror from trying the issue impartially and without prejudice to the substantial rights of either party," *State v. Brown,* 732 N.W.2d at 629 n. 2 (Minn.2007). Racial bias generally falls within the category of actual bias. *Id.* at 630 n. 2. Actual bias is a question of fact, *Patton v. Yount,* 467 U.S. 1025, 1036, 104

S.Ct. 2885, 81 L.Ed.2d 847 (1984), which the district court is in the best possession to evaluate, *see Ossenfort v. Associated Milk Producers, Inc.,* 254 N.W.2d 672, 687 (Minn.1977). A finding by a district court of the presence or absence of bias is "based upon determinations of demeanor and credibility" and, thus, entitled to deference. *Wainwright v. Witt,* 469 U.S. 412, 428, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

 The district court here found that Evans failed to prove by a preponderance of the evidence that the juror made the Hurricane Katrina statement or that a racially-biased individual sat on the jury in Evans's trial. It appears that the court found C.A.'s testimony incredible. The court found that C.A. was the only person who testified as to actually hearing the alleged Hurricane Katrina comment, and that although the hurricane was discussed in media reports around the time of Evans's trial, the juror could not have made the statement right after the hurricane hit—as C.A. testified—because the hurricane happened in August 2005 and the juror supposedly made the statement in January 2006.

The district court additionally declined to find that the juror was dishonest when she answered race-related questions on the jury questionnaire,[19] and when she said it is not appropriate to use racist language. The court's conclusion was based on testimony by the juror and the State's witnesses who testified that the juror "associates with numerous African–American people in her workplace"; that

---

the juror's testimony during his cross-examination of her at the *Schwartz* hearing. If we were to reach this issue, we would hold that even if Evans had objected to the letter and the contact, he would not be entitled to a new trial because it was harmless error.

**19.** False answers to questions in a voir dire questionnaire are treated similarly to false answers given in voir dire. *See United States v. Henley,* 238 F.3d 1111, 1121–22 (9th Cir. 2001) (remanding to district court for findings as to whether juror made racist comments to determine whether answers to "voir dire questionnaire" were truthful).

happy hours and Sunday card games at the Lucky Foxx constitute a significant portion of the juror's social life, and that her behavior has been unaffected by the increasingly diverse clientele at the bar; and that the owner of the bar, a Filipino, knows the juror well, has never heard her say anything racist, and has never heard other people at the bar refer to the juror as racist.[20]

We recognize that C.A. and her pull-tab coworkers presented facts that weigh against the district court's findings. First, it is arguably unlikely that C.A., who had only one dispute with the juror, would fabricate an intricate story about the Hurricane Katrina comment and then report it to the district court. Second, C.A.'s coworker and manager, while not witnesses to the Hurricane Katrina statement, generally supported the proposition that the juror harbors negative racial attitudes. In the end, however, this is a fact question. We are confined by the standard of review and, while the district court could have concluded otherwise, we cannot say based on this record that the district court's findings of fact were clearly erroneous.

For all of these reasons, we conclude that Evans was not denied a fair trial or impartial jury and, therefore, that Evans is not entitled to a new trial. *See United States v. Rouse,* 111 F.3d 561, 572–73 (8th Cir.1997) (concluding, after holding an evidentiary hearing to investigate a telephone call to the court alleging that one of the jurors was racist, that the juror had " 'responded honestly and accurately' during *voir dire* and had not concealed 'any racial-

ly prejudiced attitudes, beliefs, or opinions' " and that the defendant was not entitled to a new trial).

### III.

Evans next argues that his Sixth Amendment right of confrontation was violated with regard to the State's trial witness, J.M. Specifically, Evans claims his rights were violated because the district court limited his access to J.M.'s medical records and unnecessarily restricted the defendant's ability to cross-examine J.M. The district court has broad discretion in evidentiary matters, such as those at issue here, but we have recognized that the Confrontation Clause operates as a limit on that discretion. *See, e.g., State v. Tran,* 712 N.W.2d 540, 550–51 (Minn.2006) ("The discretionary authority of the court to control the scope of cross-examination is limited by the Confrontation Clause of the Sixth Amendment." (internal quotation marks omitted)).

### A.

We turn first to the issue regarding J.M.'s medical records. The defendant learned, by reviewing transcripts of police interviews with J.M.'s parents, that J.M. agreed to go to Regions Hospital on the night of May 5 as a result of a family intervention. In the police interviews, J.M.'s mother described the intervention and said that she hoped the police got a good interview with J.M. "because he is schizophrenic" (though she acknowledged that he was not so diagnosed). She also said that he was delusional. But she said

---

**20.** Evans argues that the testimony given by the owner of the Lucky Foxx, a fellow bar patron, and the juror's coworkers is irrelevant as to the narrow question of whether the juror made the Hurricane Katrina comment. The district court relied on the testimony of these witnesses when it considered whether the juror lied on the jury questionnaire, and consequently when it evaluated the broader question of whether a racially-biased person sat on Evans's jury. Evidentiary rulings are within the district court's discretion, and Evans has not shown an abuse of that discretion here. *See State v. Caine,* 746 N.W.2d 339, 349 (Minn.2008).

that she was "glad you got him now because he was very, very sensible" on the night of the shooting. J.M.'s father said that J.M. was "having very bad hallucinations, and people are after him," but he also said that J.M. "was fine" the night of the shooting. Based on the police interviews of J.M.'s parents, the defendant made a pretrial motion "[r]equesting that the Court conduct an *in camera* examination of *all* medical/psychiatric/psychological records of [J.M.] ... [to] determine whether said information contained in said records is capable of assisting the defendant in preparing for his defense." (Emphasis added.)

■ The district court granted the motion in part, agreeing to review in camera the records from J.M.'s visit to Regions Hospital on May 5, 2005. After this review, the court ordered the production of a one-page redacted copy of the medical records from J.M.'s May 5 visit.[21] Evans challenges this decision.

■ The district court in this case was called to balance J.M.'s right to privacy against Evans's right to confront the witnesses against him. As the district court noted, simply because J.M. "happen[ed] to be driving down the street shouldn't mean that [his] private medical records become open to anybody." Indeed, medical records are generally protected from disclosure due to the physician-patient privilege. *See* Minn.Stat. § 595.02, subd. 1(d), (g) (2006). But like other privileges, the medical privilege "sometimes must give way to a defendant's right to confront his accusers." *State v. Kutchara*, 350 N.W.2d 924,

926 (Minn.1984). We have held that the proper procedure to follow in cases such as this is for the district court to review the medical records at issue in camera to determine whether the privilege must give way. *State v. Reese*, 692 N.W.2d 736, 742 (Minn.2005). This approach "strikes a fairer balance between the interest of the privilege holder in having his confidences kept and the interest of the criminal defendant in obtaining all relevant evidence that might help in his defense." *State v. Paradee*, 403 N.W.2d 640, 642 (Minn.1987).

■ The district court followed the approach our jurisprudence directs, and we review a district court's decision to limit a defendant's use of medical records to impeach a witness for abuse of discretion. *See Reese*, 692 N.W.2d at 742–43 (concluding that the district court's decision to limit the disclosure of the victim's prior medical records was within the court's discretion). Evans argues that the court abused its discretion because the court "limited the scope of its review to medical records of [J.M.'s] visit to Regions Hospital on May 5." Because "details about his underlying mental health problems may not have been part of the May 5 Regions records," Evans argues the district court's in camera review of only those records "was too narrow to make an informed determination." But a defendant must make some showing that a confidential file contains information that would be material and favorable to his case. *See State v. Hummel*, 483 N.W.2d 68, 72

---

**21.** The redacted medical record made available to the defendant included, in part, the following information: J.M. went to the hospital on May 5 "with the complaint of depression"; he was "awake [and] alert," his "[t]hought process seem[ed] fairly organized," and his "cognition," "[o]rganization," "[c]omprehension," "concentration," and

"[m]emory for recent and remote * * * seem[ed] good." The social worker who evaluated him "felt that he didn't seem to be holdable," and J.M. was "discharged home in stable condition." The district court ruled that "[a] complete copy of J.M.'s medical records" from the May 5 visit "will remain under seal." *See* Minn. R.Crim. P. 9.03, subd. 6.

(Minn.1992).[22]

While Evans seems to be arguing that the district court should have reviewed "all" of J.M.'s medical records or at least those records that followed the May 5 visit, Evans did not make any showing that any medical records existed prior to or after the May 5 visit that would have been material and favorable to Evans's ability to cast doubt on J.M.'s credibility. At most, Evans established that the records from the May 5 visit might contain such information. For instance, the family conducted an intervention so that J.M. would *start* receiving medical treatment on May 5. While J.M.'s mother believed he was schizophrenic, she acknowledged that J.M. had not been diagnosed as schizophrenic. And neither of J.M.'s parents mentioned any prior medical treatment in their police interviews; they discussed only the visit to Regions Hospital on May 5. Additionally, Evans has not shown that the records from any follow-up visits that occurred after May 5 contained any information relevant to J.M.'s condition on May 5.[23] In short, Evans made "some showing" that the May 5 records were "reasonably likely to contain information related" to J.M.'s

credibility as a witness to the murder, but he made no showing as to any other records. *Hummel*, 483 N.W.2d at 72. He offered only argument and conjecture, but that is not sufficient because "having the trial court review confidential material is not a right. It is a discovery option, but only after certain prerequisites are satisfied." *Id.* Accordingly, we hold that the district court did not abuse its discretion in limiting its review to the records from the May 5 visit.

Evans also seems to contend that the district court redacted too much information from the May 5 records. We have reviewed the complete unredacted record from the May 5 visit. Based on our review of this record, we conclude that the district court properly balanced J.M.'s right to privacy against Evans's right of confrontation and gave Evans access to that information potentially probative of J.M.'s credibility. *See Kutchara*, 350 N.W.2d at 926–27 (concluding that district court did not abuse its discretion in giving defendant access to victim's medical records from the assault at issue but denying him access to victim's past medical records). We hold

22. In *Hummel*, the district court denied the defendant's motion for an in camera review because the defendant did not show that the "material sought was relevant and contained exculpatory information." 483 N.W.2d at 72. We held that this standard was too rigorous, and cited the standard discussed by the Supreme Court in *Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987), which provides that "a defendant may not have a confidential file reviewed 'without first establishing a basis for his claim that it contains material evidence.'" *Hummel*, 483 N.W.2d at 72 (quoting *Ritchie*, 480 U.S. at 58 n. 15, 107 S.Ct. 989). We said that this standard requires that a defendant "make some 'plausible showing' that the information sought would be 'both material and favorable to his defense.'" *Id.* (internal quotation marks omitted). We concluded that the defendant's showing was insufficient to trigger

the need for in camera review because the defendant made no showing as to how the confidential records at issue in that case "could be related to the defense or why the file was reasonably likely to contain information related to the case." *Id.* More recently in *State v. Burrell*, 697 N.W.2d 579, 605 (Minn. 2005), we said that "[a] defendant requesting *in camera* review must make at least some 'plausible showing' that the information sought would be material and favorable to his defense."

23. As further discussed below, we conclude that Evans's right of confrontation did not require access to J.M.'s medical records from follow-up visits that occurred after May 5 because Evans had the ability to cross-examine J.M. with the statements he made on May 6.

that the district court did not abuse its discretion by redacting the record from May 5.

### B.

We turn next to Evans's claim that his ability to cross-examine J.M. was so limited as to violate his right to confront this witness. The constitutional right of confrontation "guarantees only an opportunity for cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Tran*, 712 N.W.2d at 551 (internal quotation marks omitted). Here, Evans was able to impeach J.M. with earlier statements J.M. had given to police immediately after the incident and to ask J.M. about inconsistencies between his testimony at trial and his testimony at the grand jury. The district court also specifically ruled that the cross-examination of J.M. could include questions about whether he was on his way home from the hospital when he witnessed the shooting, how long he was at the hospital, the reason for his visit, and whether a doctor saw any reason for him to remain at the hospital. Thus, the defendant was able to cross-examine J.M. about the family intervention, his visit to the hospital, and the reason for his going to the hospital.[24]

Evans relies on *State v. Wildenberg*, 573 N.W.2d 692 (Minn.1998), in contending that the district court erred. In *Wildenberg* we concluded that defendant's Sixth Amendment right of confrontation was violated when he was denied access to the personal journals of a juvenile victim of an alleged sexual assault because "[w]ithout the journals in evidence or [the victim] subject to cross-examination regarding

their content, the jury was left to speculate that they contained" accounts of criminal sexual conduct. *Id.* at 698. Evans's reliance on *Wildenberg* is misplaced. Unlike in *Wildenberg*, where the jury was left to speculate about whether the comments in the personal journals provided direct evidence about the underlying crime, the district court here allowed the defendant to elicit the reason for J.M.'s visit to the hospital on the night of the shooting, and the jury learned that J.M. had gone to the hospital "at the insistence of [his] parents because of their concern for [his] emotional state." Evans was thereby allowed to challenge J.M.'s credibility through this cross-examination and present his theory to the jury that J.M. was not a reliable witness. *See State v. DeVerney*, 592 N.W.2d 837, 845 (Minn.1999) (concluding that defendant's confrontation rights were not violated because limitations on cross-examination "did not prevent [defendant] from discrediting [the witness's] testimony as biased"). We hold that the district court did not abuse its discretion in limiting Evans's ability to cross-examine J.M. and that the limitation did not violate Evans's right of confrontation.

### IV.

Evans next argues that the district court's jury instructions were erroneous because the jury was instructed that Evans need not have known or have had reason to know that the victim was a peace officer. Jury instructions are reviewed for abuse of discretion. *State v. Moore*, 699 N.W.2d 733, 736 (Minn.2005). In particular, we review jury instructions as a whole to determine whether they fairly and adequately explain the law. *Id.*

---

**24.** Additionally, J.M.'s parents testified for the defendant. J.M.'s father testified that he and his family had "a meeting trying [to] get some help for [J.M.]." J.M.'s mother similarly testified that J.M. had "been suffering from marital problems and seemed depressed and the like."

Minnesota Statutes § 609.185(a)(4) states that a person is guilty of first-degree murder if that person "causes the death of a peace officer ... with intent to effect the death of that person or another, while the peace officer ... is engaged in the performance of official duties." The district court's instructions were derived from 10 Minn. Dist. Judges Ass'n, *Minnesota Practice–Jury Instruction Guides, Criminal,* CRIMJIG 11.11 (5th ed.2006). The JIG includes the following element: "at the time the defendant committed the act that caused the death of _____, the decedent was engaged in the performance of official duties as a *(peace officer)*. " *Id.* Before trial, the State asked the court to add the following sentence to the instruction: "Defendant need not have known or have reason to know that Gerald Vick was a peace officer." The defendant argued that the instruction was adequate "without that additional language." The court decided to include the language, and instructed the jury that Evans "need not have known or have reason to know that Gerald Vick was a peace officer."

The district court's decision to include the instruction was based on *State v. Angulo,* 471 N.W.2d 570 (Minn.App.1991), *rev. denied* (Minn. Aug. 2, 1991). In *Angulo,* the defendant argued that the district court should have instructed the jury that the State must prove he knew or should have known that the murder victim was a peace officer. *Id.* at 572. The court of appeals noted that Minn.Stat. § 609.185(a)(4) is unlike statutes in many other jurisdictions that explicitly require that the defendant knew or should have known that the victim was a peace officer. *Angulo,* 471 N.W.2d at 572. Instead, the court of appeals concluded that "the Minnesota statute states a defendant who kills a peace officer with intent to kill a person, who, it turns out, is a peace officer performing official duties, is guilty of first-degree murder." *Id.* The court of appeals reasoned:

> Quite simply, that the victim turns out to be a peace officer acting in an official capacity is the risk one takes when acting with intent to kill. The legislature had the option of including "knowledge" as an element of the crime. It chose not to do so, and we decline to read such an element into the statute.

*Id.* The court of appeals additionally rejected the defendant's contention that without a "knowledge" requirement, the crime would be a strict liability offense. *Id.* at 573 ("Lack of knowledge of a peace officer's identity does not change the fact that intent to kill must be shown."). The court of appeals in *Angulo* also cited *State v. Brown,* 345 N.W.2d 233, 239 (Minn. 1984), in which we said "[a]lthough the legislative history regarding the enactment of the peace officer statute is silent, the most evident rational basis for enacting the statute was to deter the killing of peace officers." *Angulo,* 471 N.W.2d at 573. The *Angulo* court concluded that its reading of the statute was consistent with the policy behind the statute. *Id.*

We conclude that the court of appeals' analysis in *Angulo* was correct. Minnesota Statutes § 609.185(a)(4) is worded differently than statutes in many other jurisdictions, which include an explicit knowledge requirement.[25] Section

---

**25.** *See, e.g.,* Idaho Code Ann. § 18–4003(b) (2006) ("Any murder of any peace officer ... who was acting in the lawful discharge of an official duty, *and was known or should have been known by the perpetrator of the murder to*

be an officer so acting, shall be murder of the first degree." (emphasis added)); Mich. Comp. Laws § 750.316(1)(c) (2004) ("A person who commits any of the following is guilty of first degree murder: ... [a] murder

609.185(a)(4) is also different from statutes where a knowledge requirement can more easily be inferred from the language of the statute.[26] In contrast to these statutes, the language of section 609.185(a)(4) indicates that a person is guilty of first-degree murder if he or she "causes the death of a peace officer ... with intent to effect the death of that person *or another*, while the peace officer ... is engaged in the performance of official duties." (Emphasis added.) The "or another" language indicates that the defendant need not intend to cause the death of the peace officer to be found guilty. And there is no language in the statute indicating that knowledge of the victim's status as a peace officer is required.

■ Evans argues that the policy of protecting peace officers "is not served in circumstances such as this, where the defendant did not know of the victim's status as an officer." We reject this argument for the same reason that the court of appeals rejected it in *Angulo*. When a defendant "fires a gun intending to kill ...

[he] is ... on notice that if a peace officer engaged in official duties is killed, whether or not the defendant knew the officer's identity, the defendant will be charged under Minn.Stat. § 609.185(a)(4)." *Angulo*, 471 N.W.2d at 573.[27] We conclude, as the court of appeals concluded, that this notice "adequately implements the statute's policy of protecting and deterring the killing of peace officers."[28] *Id.* Thus, the instruction accurately stated Minnesota law.

We also conclude that it was not an abuse of discretion to include the additional sentence in this case. Because Vick was undercover when he was killed and in light of Evans's argument that Vick was not on duty, there may have been a question about whether Evans must have known that Vick "was engaged in the performance of official duties" as a peace officer to be convicted of violating Minn.Stat. § 609.185(a)(4). The district court appropriately determined that this may have been an issue of confusion for the jury. Accordingly, we hold that the district court's instruction to the jury that Evans

---

26. *See, e.g.,* Ariz.Rev.Stat. Ann. § 13–1105(A)(3) (2006) ("A person commits first degree murder if: ... [i]ntending or knowing that the person's conduct will cause death to a law enforcement officer, the person causes the death of a law enforcement officer who is in the line of duty.").

of a peace officer ... committed while the peace officer ... is lawfully engaged in the performance of any of his or her duties as a peace officer ..., *knowing that the peace officer ... is a peace officer ... engaged in the performance of his or her duty as a peace officer ....*" (emphasis added)); N.Y. Penal Law § 125.27 (McKinney 2004) ("A person is guilty of murder in the first degree when ... the intended victim was a police officer ... who was at the time of the killing engaged in the course of performing his official duties, *and the defendant knew or reasonably should have known that the intended victim was a police officer.*" (emphasis added)); Wash Rev. Code § 10.95.020(1) (2002) ("A person is guilty of aggravated first degree murder ... [if][t]he victim was a law enforcement officer ... who was performing his or her official duties at the time of the act resulting in death *and the victim was known or reasonably should have been known by the person to be such at the time of the killing ....*" (emphasis added)).

27. *See also United States v. Feola*, 420 U.S. 671, 685, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975) (holding that 18 U.S.C. § 111 (2006) only requires intent to assault, rather than intent to assault a federal officer, and noting that this interpretation is not unfair to defendants because a defendant "nonetheless knows from the very outset that his planned course of conduct is wrongful").

28. Also, as noted by the court of appeals in *Angulo*, this interpretation of the statute does not transform this crime into a strict liability offense because the State must show intent to kill. *Angulo*, 471 N.W.2d at 573.

need not have known that Vick was a police officer was not an abuse of discretion.

## V.

 Evans next argues that the district court erred when it did not issue an accomplice instruction. A criminal defendant may not be convicted based on the uncorroborated testimony of an accomplice. *See* Minn.Stat. § 634.04 (2000); *State v. Clements,* 82 Minn. 434, 443, 85 N.W. 229, 232 (1901). Indeed, in any criminal case in which it is reasonable to consider a witness against the defendant to be an accomplice, the district court must caution the jury about accomplice testimony. *State v. Shoop,* 441 N.W.2d 475, 479 (Minn. 1989). The rationale for this rule is that the credibility of an accomplice is inherently untrustworthy. *State v. LaJambe,* 300 Minn. 539, 541, 219 N.W.2d 917, 919 (1974). A district court has a duty to give an accomplice instruction regardless of whether defendant's counsel requests the instruction. *State v. Strommen,* 648 N.W.2d 681, 689 (Minn.2002).

 Evans argues that an accomplice instruction was required because Kelly testified against him. We disagree. In *State v. Swanson,* we concluded that "[a] witness who is alleged to have committed the crime *instead* of the defendant is, as a matter of law, not an accomplice." 707 N.W.2d 645, 653 (Minn.2006). Here, Evans specifically argued at trial that "the evidence will show that the State's main witness against him, Antonio Alexander Kelly, is the man who shot and killed Sergeant Gerald Vick." Therefore, because Evans's "version of the facts would not make [Kelly] an accomplice, but instead an alternative perpetrator, the district court did not err by failing to give the jury accomplice testimony instructions concerning [Kelly]." *Id.*

## VI.

 Evans next argues that he was denied a fair trial because of the "spark of life" evidence presented about Sergeant Vick. We review the decision to admit evidence for abuse of discretion. *See State v. Clifton,* 701 N.W.2d 793, 797 (Minn.2005).

We have said that "[i]n a prosecution for a homicide the state is entitled to briefly provide the jurors with a minimal amount of information identifying the victim so that the jury knows that the victim was not a number but a distinct person." *State v. Hodgson,* 512 N.W.2d 95, 97 (Minn. 1994). In other words, we have said that the prosecution may present evidence that the victim was more than "just bones and sinews covered with flesh"; rather, the victim was "imbued with the spark of life." *State v. Graham,* 371 N.W.2d 204, 207 (Minn.1985). We have said, however, that the State may not use spark-of-life evidence in an attempt to get the jury to decide the case on the basis of passion or prejudice. *Hodgson,* 512 N.W.2d at 97.

At trial, prior to the testimony of St. Paul Police Chief John Harrington, the defendant made a motion in limine to limit testimony related to Vick's service record. The defendant argued that "the evidence as presented has in fact even gone beyond spark of life." In particular, the defendant pointed to statements made by the prosecutor in the State's opening statement and the testimony of St. Paul Police Sergeant Amanda Heu, Vick's brother, and Sergeant Strong. The defendant also noted that two photographs of Vick were displayed during the testimony of Vick's brother. The State responded that the testimony presented on Vick's life had been limited and brief. The State also argued that it should be allowed to present additional evidence about Vick because the State was required to prove, as an element of the crime, that

Vick was acting as a police officer at the time he was killed. Moreover, the State noted that because the defendant argued that Vick was not acting as a police officer when he was shot, the additional testimony about Vick's duties as a police officer was necessary in this case.

The court denied the defendant's motion, stating that it did not believe the testimony in the case had reached the point where it had "inflamed people's passions in the courtroom or been unduly prejudicial." But the court also warned the State that it would "allow some testimony regarding [Vick's] record, but [it would] not allow it to linger or to reach a point where ... it is unduly prejudicial."

In the State's opening statement, the prosecutor stated that Vick had lived his life "with a passion," "lived his dreams," "lived life with a gusto," and "was particularly passionate about his work." The defendant objected when the State mentioned Vick's "dream of being a police officer" from "[w]hen he was 14, 15 years old." The district court overruled the objection, and the State finished its essentially one-or two-page description of Vick's life. The State's first witness, Heu, acknowledged that Vick was "somewhat of a mentor." Heu also testified that Vick was "a very, very good police officer and just genuinely a good person." She further testified that she "was blessed to have gotten to know him and work so closely with him in that capacity." In total the testimony consisted of six lines. The defendant did not object to the testimony. The State next called Kenneth Vick, who is Vick's brother. In

approximately eight pages of testimony,[29] Kenneth Vick described Vick's life—his childhood, his education, his career, and his family. During Vick's brother's testimony, the jury was shown two photographs of Vick. One was a photograph of Vick with his wife and two children at a Christmas party, and the other was a portrait of Vick in his police uniform. The defendant did not object or cross-examine Kenneth Vick. Additionally, Sergeant Strong testified about Vick's love for his work. The defendant objected, for various reasons, five times in three pages of testimony to the questions posed to Strong. The district court overruled the objections.

We conclude that the district court did not err when it allowed the statements in the State's opening statement or the testimony of the witnesses prior to Harrington to come into evidence. The testimony showed that Vick was "not just bones and sinews covered with flesh, but was imbued with the spark of life," *Graham*, 371 N.W.2d at 207, and does not appear to have been an attempt to get the jury to decide the issue based on passion or prejudice.

Moreover, the "spark of life" evidence was relevant to an issue in the case. In *Hodgson*, we allowed the State to play a 45-second video of the victim playing basketball for his high school basketball team because, in part, it was "evidence bearing on defendant's theory [of the case]."[30] *Hodgson*, 512 N.W.2d at 98. Here, the evidence was similarly relevant because it was evidence related to Evans's claim that

---

**29.** In total, the transcript is approximately 1900 pages.

**30.** In *Hodgson*, the defendant had "two fresh cuts on his face, bruises and cuts on his forearms and a large mark on the back of his left arm later identified as a fresh human bite

mark," signs that he had recently struggled with an athletic victim. *Hodgson*, 512 N.W.2d at 97. The defendant's theory of the case was that his ex-girlfriend, a smaller, less athletic person, had struggled with and stabbed the victim. *Id.* at 98.

Vick was not on duty when he was killed. Specifically, the evidence was introduced to show that Vick was passionate about his work and that he often worked undercover in capacities that one normally might not associate with the work of a police officer.

The district court also acted within its discretion in its handling of Harrington's testimony. After denying the defendant's motion, the district court appropriately followed through on its warning to the State that it would carefully monitor Harrington's testimony. For instance, after Harrington described in two-and-a-half pages of testimony two examples of undercover operations in which Vick had previously been involved, the court sustained the defendant's objection and prevented the State from eliciting testimony about additional undercover operations.

We hold that Evans's right to a fair trial was not violated because of the spark-of-life evidence presented about Vick.

## VII.

Evans makes a number of additional arguments in his pro se brief. We turn next to these arguments.

### A.

██ Evans first argues that the evidence was insufficient to support the verdict. In particular, Evans contends that there was insufficient evidence to support the finding that Vick was "engaged in the performance of official duties" under Minn. Stat. § 609.185(a)(4). He notes that Vick's blood-alcohol concentration was twice the legal limit when he was driving his vehicle, and that Minn.Stat. § 624.7142 (2006) prohibits a person with a blood-alcohol concentration above .04% from carrying a pistol. When faced with a sufficiency of the evidence claim, we conduct a thorough review of the record "to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." *State v. Fields*, 679 N.W.2d 341, 348 (Minn.2004). (internal quotation marks omitted).

The evidence was sufficient to support the verdict in this case. There was a great deal of testimony at trial relating to whether Vick was on duty when he was killed. For instance, Strong testified that he and Vick wore casual clothing and drank alcohol that night so that they would fit in with other patrons at the bars. Strong also testified that he and Vick purchased alcohol with police department funds, and that they drove unmarked police cars. Strong testified that after it became clear that their prostitution investigation would not yield any arrests that night, they stayed at the bar to socialize with patrons so that they could less conspicuously enter the bar in the future and to look for any other signs of illegal activity. Additionally, Strong testified that he and Vick had a duty to control public intoxication and public urination.

Commander Todd Axtell testified that Vick was on duty when he was shot. Axtell explained that Vick's shift continued until 2:30 a.m. on May 6. He testified that officers are expected to act whenever they observe criminal activity at any time in the City of St. Paul. Axtell finally testified that Vick was on duty because he had not yet returned his city-owned undercover vehicle to the police department.

Chief Harrington's testimony also supports the jury's finding that Vick was on duty. Harrington testified that Vick's survivors were paid line-of-duty benefits after his death and that with respect to Vick's funeral, the department followed the protocol that is followed when an officer dies in the line of duty. Harrington's testimony was also consistent with Strong's testi-

mony that undercover officers may consume alcohol while on duty.

▮ We hold that the evidence was sufficient to show that Vick was on duty as a police officer when he was killed.[31]

### B.

▮ Evans next argues that the district court erred in admitting into evidence statements Sergeant Frazer made during an interview with Evans. Evans cites *Bernhardt v. State,* 684 N.W.2d 465 (Minn. 2004), in support of his argument. In *Bernhardt,* we considered a case where the jury heard an audio taped interview in which an officer falsely stated that two others had implicated the defendant in a murder. *Id.* at 472. We concluded that admitting the officer's statement into evidence was plain error because the statements were a false representation of what the alleged accomplices had actually said, and because the statements "c[a]me closer to direct evidence than anything else the jury heard." *Id.* at 475–76. Evans compares his case to *Bernhardt,* because the jury learned during Frazer's testimony that in an interview with Evans, Frazer told Evans that Kelly had implicated Evans in Vick's murder. Evans's reliance on *Bernhardt* is misplaced. Frazer's statements were made as part of a hypothetical, prefaced by the words "what if," not stated as actual fact as they were in *Bernhardt.* Moreover, Kelly actually testified at trial (where he was available for cross-examination), and Kelly's testimony (along with much of the other evidence offered at trial)

was consistent with the hypothetical that Frazer posed. For these reasons, we hold that the district court's ruling was not erroneous and Frazer's testimony did not deny Evans a fair trial.[32]

### C.

▮ Evans next argues that the district court erred in denying his motion for a change of venue. To prevail on this argument, Evans must show that he suffered actual prejudice and that "the [pretrial] publicity 'affect[ed] the minds of the specific jurors involved in the case.'" *State v. Berkovitz,* 705 N.W.2d 399, 408 (Minn.2005) (quoting *State v. Fratzke,* 354 N.W.2d 402, 406 (Minn.1984)). Evans has offered "no evidence suggesting that the pretrial publicity surrounding [his] case affected any of the jurors who sat on [his] case or that the denial of [his] change of venue motion resulted in actual prejudice to [him]." *Id.; cf. State v. Kinsky,* 348 N.W.2d 319, 324 (Minn.1984) (concluding that, even though three jurors "admitted to having formed impressions about defendant's guilt from the pretrial publicity," the district court was in the best position to evaluate each juror's claim that he or she could be impartial, and an appellate court should not lightly substitute its own judgment). We therefore hold that the district court did not err when it denied Evans's motion for change of venue.

### D.

▮ Evans next argues that the district court erred when it refused to allow

---

31. Evans also makes a general sufficiency of the evidence argument, contending that all of the evidence at trial was insufficient to support the verdict. Based on the testimony of Strong, J.M., and Kelly, as well as the 3M security videotape and the DNA evidence found on the murder weapon, we conclude that the evidence was sufficient to support the conviction.

32. Evans also argues that he was denied effective assistance of counsel at trial because counsel failed to object when Frazer's statements were admitted into evidence. Because we conclude that the admission of Frazer's statements was not error, we hold that Evans was not denied effective assistance of counsel.

the defendant to cross-examine Kelly using an audio-taped telephone conversation between Kelly and his girlfriend to impeach Kelly under Minn. R. Evid. 608. Kelly's conversation with his girlfriend took place before a hearing in a domestic abuse matter unrelated to this case. Evans argues that the audiotape indicates that Kelly encouraged his girlfriend to lie and that Kelly will "lie or scheme his way out of trouble." We review a district court's evidentiary ruling for abuse of discretion. *See Clifton,* 701 N.W.2d at 797.

Minnesota Rule of Evidence 608(b) states that specific instances of conduct of a witness, if probative of truthfulness or untruthfulness, may be inquired into on cross-examination of the witness. Our review of a transcript of the audiotaped conversation leads us to agree with the district court's assessment that the audiotape was of limited probative value and any probative value was outweighed by the danger of confusing the jury. *See* Minn. R. Evid. 403; *see also State v. Haney,* 219 Minn. 518, 520, 18 N.W.2d 315, 316 (1945) ("In the discretion of the trial court, as an exception to the rule, evidence as to independent and disconnected acts may be received for the specific purpose of affecting the credibility of the accused if its effect upon credibility is not too remote or if its probative value is not outweighed by the risk that its admission will (a) necessitate undue consumption of time, or (b) create a substantial danger of undue prejudice or of confusing the issues or of misleading the jury. . . ."). We therefore hold that the district court did not abuse its discretion when it prohibited Evans from using the evidence.

### E.

Finally, Evans argues that he was denied a fair trial because of several instanc-

es of prejudicial prosecutorial misconduct. We have carefully reviewed all of Evans's prosecutorial misconduct claims and conclude that there was no prosecutorial misconduct in this case.

Affirmed.

MAGNUSON, C.J., and DIETZEN, J., not having been members of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

PAGE, Justice (dissenting).

I respectfully dissent. I do so because the court today fails to recognize that the rationale behind the prohibition against post-verdict communication between attorneys and jurors before a *Schwartz* hearing has been granted, as well as the prohibition itself, applies with equal force after a hearing has been granted. In *Schwartz v. Minneapolis Suburban Bus Co.,* 258 Minn. 325, 104 N.W.2d 301 (1960), we held that it was improper for litigants to have post-verdict contact with jurors for purposes of attaining information to be used to impeach the verdict. *Schwartz* involved a defeated litigant in a civil matter whose counsel had contacted a juror without permission from the trial court for the purpose of ascertaining whether the juror had been untruthful during voir dire. In explaining our holding, we indicated,

> rather than permit or encourage the promiscuous interrogation of jurors . . . the better practice would be to bring the matter to the attention of the trial court, and, if it appears that the facts justify so doing, the trial court may then summon the juror before [the court] and permit an examination in the presence of counsel for all interested parties and the trial judge *under proper safeguards* .[1]

---

**1.** We have rarely used the phrase "under proper safeguards" outside of the *Schwartz*

*Id.* at 328, 104 N.W.2d at 303 (emphasis added) (footnote added). Underlying our holding was our concern that "it is undesirable to permit attorneys or investigators ... to harass jurors by submitting them to interrogation ... without more protection for the ascertainment of the facts...." *Id.*, 104 N.W.2d at 303. Undoubtedly, *Schwartz* stands for the proposition that defeated litigants should refrain from contacting and harassing jurors after the verdict. *See Olberg v. Minneapolis Gas Co.*, 291 Minn. 334, 344, 191 N.W.2d 418, 425 (1971). Yet, as noted above, the court in *Schwartz* was concerned with more than just the harassment of jurors. The court was equally concerned with maintaining the integrity of the fact-finding process, and the court's holding was intended to prevent situations in which jurors would discuss possible misconduct allegations with a party outside of the safeguards provided in a court hearing, *Schwartz*, 258 Minn. at 328, 104 N.W.2d at 303, thereby ensuring the trustworthiness of testimony regarding juror misconduct. Concerns related to the integrity of the fact-finding process and the trustworthiness of juror testimony do not dissipate with the granting of a *Schwartz* hearing. If anything, they are heightened.[2]

We are not alone in being wary of the accuracy of juror statements obtained ex parte. For example, the district court in *U.S. v. Narciso*, 446 F.Supp. 252, 324 (D.Mich.1977), *overruled on other grounds by U.S. v. Griffith*, 864 F.2d 421, 424 n. 2 (6th Cir.1988), specifically reprimanded the government for contacting jurors after they knew that the defendants had made formal post-trial motions. The court listed four reasons for prohibiting post-trial contact between jurors and attorneys: "(a) avoid harassment of jurors, thereby encouraging freedom of discussion in the jury room, (b) reduce the number of meritless post-trial motions, (c) *eliminate a significant source of jury tampering*, and (d) increase the certainty of verdicts." *Id.* (citations omitted) (emphasis added). Of note, the court indicated that the governments extended discussions with two jurors makes it difficult, if not impossible, for the Court to question them free from the impact of having discussed the case with trial counsel. *Id.* at 325.[3]

Minnesota Rule of Criminal Procedure 26.03, subdivision 19(6), essentially codifies for criminal cases the procedures set out in *Schwartz*, focusing on maintaining the integrity of the fact-finding process. *State v. Larson*, 281 N.W.2d 481, 484 (Minn. 1979). Specifically, the rule provides that "[a] defendant who has reason to believe that the verdict is subject to impeachment shall move the court for a summary hearing. If the motion is granted the jurors *shall be interrogated under oath and their testimony recorded.*" Minn. R.Crim. P. 26.03, subd. 19(6) (emphasis added). Con-

---

context, but when used, it is often in conjunction with the phrase "designed to preserve the rights of both parties" in the context of presenting evidence before a fact-finder. *See, e.g., Salo v. Duluth & I.R.R. Co.*, 121 Minn. 78, 86, 140 N.W. 188, 191 (1913) (regulating the admissibility of a date on a telegram); *Wanek v. City of Winona*, 78 Minn. 98, 99–100, 80 N.W. 851, 851 (1899) (ordering plaintiff to submit to a physical examination).

2. Although the *Schwartz* procedures originated in the context of a civil case, the concerns underlying the adoption of those procedures are also heightened in criminal cases because of the criminal defendant's Sixth Amendment right to a fair trial.

3. The court in *Narciso* also noted that often "in post-trial interviews the questioners desire to make the jurors want to give certain answers and the jurors themselves 'are always ready to be on the side of whoever asks them.'" *Narciso*, 446 F.Supp. at 325 (citing *N. Pacific Ry. Co. v. Mely*, 219 F.2d 199, 202 (9th Cir.1954)).

sistent with my reading of *Schwartz*, I read the rule's "shall be interrogated under oath and their testimony recorded" language to preclude parties in a criminal proceeding from contacting jurors to obtain information regarding possible impeachment of the verdict. Because the rule does not contain any limiting language, I do not read the rule, or *Schwartz*, to limit the prohibition against contact with jurors to the time period before a hearing is granted. If the policies underlying the *Schwartz* procedures and the rule are to be met, it makes no sense to treat contact with jurors after a hearing has been granted differently from contact with jurors before a hearing has been granted.

As the court correctly points out, our review is for plain error. *State v. Goelz*, 743 N.W.2d 249, 258 (Minn.2007). Because I believe that the policies underlying the procedures set forth in *Schwartz* and Rule 26.03, subdivision 19(6), as well as the procedures and the language of the rule themselves, clearly prohibited the State from having contact with the juror outside of the hearing granted by the district court, I conclude that the district court committed error that was plain when it authorized such contact. The State's contact with the juror, though authorized by the district court, affected Evans' substantial rights because, as *Narciso* points out, the ex parte contact with a juror under these circumstances made it "difficult, if not impossible, for the [district] court to question [the juror] free from the impact of having discussed the case with [the county attorney and BCA investigators]" and because it is difficult, if not impossible, to assess the trustworthiness of the juror's testimony. Finally, in order "to ensure fairness and the integrity of judicial proceedings," I believe this court must reverse Evans' conviction and remand for a new trial. *State v. Griller*, 583 N.W.2d 736, 740 (Minn.1998).